UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ROBERT D. FITZGERALD and THE TROY
POLICE BENEVOLENT AND PROTECTIVE
ASSOCIATION,

                                Plaintiffs,

        -against-

                                  **1:10 CV 00451
(MAD/RFT)**

CITY OF TROY, NEW YORK; HARRY J. TUTUNJIAN,
in both his individual capacity and his official capacity as
Mayor of the City of Troy; JOHN TEDESCO, individually
and as an Assistant Chief of Police for the City of Troy;
DAVID MITCHELL, individually; JANE ROE,
individually and in her official capacity as a
representative of the City of Troy; and JOHN DOE,
individually and in his official capacity as a representative
of the City of Troy,

                                Defendants.

# MEMORANDUM OF LAW

Respectfully submitted,

NAPIERSKI, VANDENBURGH,
NAPIERSKI & O'CONNOR, LLP
Attorneys for Defendants
296 Washington Avenue Ext., Ste. 3
Albany, NY 12203
(518) 862-9292

## Statement of Facts

This action is brought by Robert Fitzgerald, a police officer employed by the City of Troy, New York and President of the Troy Police Benevolent and Protective Association, Inc. ("PBA") and the Troy PBA, alleging several constitutional claims as well as State claims. The essence of the suit involves the application of a 1995 Troy City Ordinance requiring police officers, hired after the effective date, to reside within the City of Troy.[1]

In early 2007, enforcement of the residency ordinance was advocated by certain members of the Troy City Council to disqualify several police officers on an eligible list for promotion to Sergeant ("Sergeant's List") who, admittedly, were in violation of the residency requirement. (Fitzgerald Dep. 14-15; 24-25).[2]   It was rumored within the Police Department that Officer Steven Seney, who was on the Sergeant's List, had written an anonymous letter to the Troy Civil Service Commission identifying several officers on the Sergeant's List who did not reside in the City of Troy. (Id., 74).

Although it was apparent from the Sergeant's List itself that certain officers resided outside the City, the residency ordinance had not been enforced and it became a bone of contention that someone was anonymously encouraging that it be enforced with respect to the Sergeant's List. (Id., 31-32).   It became, in short, a heated issue within the Troy Police Department over who belonged on the Sergeant's List and who did not. (Id., 29).

---

[1] The ordinance in question withstood a judicial challenge to a claim that the ordinance was "inconsistent with or preempted by" Public Officers Law § 3(12) and § 30(6). (See Troy Benevolent and Protective Association, Inc. v. City of Troy, 29 A.D.2d 710 (3 Dept. 2002), lv. dn. 100 N.Y.2d 507 (2003)).

[2] See Dep. Ex. "HH" identified by plaintiff as the Sergeant's Promotion List in effect in April, 2007.

On Monday, April 9, 2007[3], at a regularly scheduled PBA Meeting, there was a discussion of the issue. (Id., 52-53). Plaintiff testified that certain officers were upset over possibly losing their spot on the Sergeant's List "and it became a rather boisterous meeting." (Id., 53). Plaintiff recalled someone at the meeting threatened to inform Seney's wife about an extramarital affair, (Id., 56-57), the threat presumably associated with suspicion within the Department that Seney was the author of the anonymous letter.

On Wednesday, April 11, 2007, the Troy Civil Service Commission sent letters to certain individuals on the Sergeant's List advising them that they would be disqualified from consideration because they were in violation of the residency ordinance. This according to plaintiff, intensified the controversy. (Id., 33).

On Friday, April 13, 2007, the department's Emergency Response Team ("ERT") conducted a training session at Lansingburgh High School in Troy, New York. (Id., 69). Plaintiff Fitzgerald was a member of the ERT team and present at the session. (Id.).[4] He testified the Sergeant's List and residency ordinance were the subject of another boisterous discussion during the lunch break. (Id., 72-73; 75-76). During the discussion, anger was again expressed at Steve Seney (Id., 79-80)("Anger is a pretty good word, yeah."), with one officer complaining that Seney did not back up his people or that he was always the last one to respond to a call. (Id., 78-80; 110-111). The threat to inform Seney's wife of extramarital affairs was also repeated. (Id., 113-114). Plaintiff felt that the controversy was heating up. (Id., 82)("Before that, yeah, and including that, yes.").

---

[3] Plaintiff testified the meeting occurred on the second Monday in April, 2007. (Id., 42-43).

[4] Deposition Ex. "11" was identified by plaintiff as the attendance record for the April 13, 2007 ERT training session. (Id., 69-70).

Fitzgerald testified he was concerned about Officer Seney's physical safety (Id., 83) and felt a responsibility to report the problem to then Asst. Chief John Tedesco. (Id., 83-84). ("I did. I felt the responsibility to report it. Yes."). He felt there was a reasonable potential for some type of violence; accordingly, he went to Asst. Chief Tedesco following the training session to report the problem. (Id., 86).

Fitzgerald advised Tedesco that officers were upset with Seney and that it would not surprise him "if someone decides to invite him out in the garage, of all places." (Id., 89). The officers "were blaming Steve for this anonymous letter that was out there in getting them - - I mean, it was heated up because guys were possibly losing their jobs ..." (Id., 89-90). The conversation lasted about five minutes and Tedesco responded something to the effect that "if a fight takes place there will be discipline ... and I will deal with it. If it happens, then I'll deal with it." (Id., 92). Plaintiff only spoke to Asst. Chief Tedesco about his apprehension of physical violence, no one else. (Id., 91-92).

Asst. Chief Tedesco recalled Officer Fitzgerald coming to his office that day wearing his battle dress uniform, since he had been at ERT training earlier. (Tedesco Depos., 20). According to Tedesco, Fitzgerald appeared agitated, his face flushed and he appeared upset. (Id., 22). Tedesco confirmed that Officer Fitzgerald stated that people were upset with Seney and there could be a physical confrontation. (Id., 22). Fitzgerald stated that people "were very, very angry at Steve Seney." Tedesco confirmed he responded that any officers who were involved in physical confrontation will be disciplined or something to that effect. (Id., 23). Tedesco agreed the meeting was brief, lasting about five minutes. (Id., 25).

After Fitzgerald left his office, Tedesco called Capt. Anthony Magnetto, Patrol Captain of the afternoon shift since most of the people concerned with the Sergeant's Residency issue were on Capt. Magnetto's shift.  (Id., 24).  Capt. Magnetto informed Asst. Chief Tedesco that he was aware of the controversy over the Sergeant's List and had arranged a meeting between Officers Kittle and Seney to discuss the matter with them "because it was getting increasingly hostile."  (Id., 24-25).   Tedesco offered to sit in on that meeting but Capt. Magnetto said he would handle it and advised him if he needed Tedesco's assistance.  (Id.).

As Tedesco was leaving work on April 13, 2007, he encountered Officer Seney outside the police station with Sgt. Brian Owens.  (Id., 27-28).  Tedesco asked Seney "what was up with Fitzy", recounting his conversation with Officer Fitzgerald.  Seney said that he had no idea what Fitzgerald was talking about.  (Id., 28).  After this exchange with Seney, Tedesco left stating he would see Seney the next morning at Karate.  (Id., 32).

Tedesco next spoke to Officer Seney on Saturday morning, April 14, 2007 at Karate class, which they both attended.  (Id., 36-37).  Tedesco started to tell Seney about his conversation with Capt. Magnetto the day before regarding a meeting with Officer Kittle.  However, Seney interrupted stating he didn't think the meeting would take place, describing his late Friday afternoon conversation with Officer Fitzgerald which included threats to him and his family.  (Id., 37-38).  Seney said he had spoken to Officers McDonald and Kittle Friday evening, after his conversation with Officer Fitzgerald, who

4

assured him that that no threats had been made against him or his family at training session. (Id., 39). Seney said Officer Fitzgerald also called him later Friday evening. (Id., 39).

Asst. Chief Tedesco advised Seney that, as Assistant Chief, he had a duty to report the matter to Chief of Police Nick Kaiser. (Id., 40). Shortly after arriving home, Tedesco called Chief Kaiser, told him of his conversation with Officer Fitzgerald and Capt. Magnetto on Friday and the conversation with Steve Seney Saturday. (Id., 40-41). Tedesco suggested that Chief Kaiser and the two Assistant Chiefs meet that day and that ERT operations be suspended until such time as they determine whether the threats were "active, valid." (Id., 40-41). Chief Kaiser directed Tedesco to have Officer Seney prepare a report for submission to Chief Kaiser on Monday, April 16, 2007 and declined Tedesco's recommendations that they meet that day and suspend the ERT operations in the meantime. (Id., 41). Later Saturday afternoon, Chief Tedesco called Capt. Magnetto informing him of his conversation with Officer Seney that morning. Capt. Magnetto said he planned to go down to the "platoon" at 3:00 p.m. or so and talk to the Sergeants about the matter. (Id., 44). Tedesco then called Seney's wife and assured her that they would be looking out for her and her husband's safety. (Id., 44-45). Still later that afternoon, he received a call from Officer Seney who stated that he had discovered writing on a "grease board" in the substation stating that Seney was a "Rat". Tedesco directed that a Sergeant photograph the writing on the grease board. (Id., 45).

Pursuant to Chief Kaiser's instructions, Asst. Chief Tedesco instructed Seney to prepare a written report describing what had occurred on Friday and Saturday, April 13

and 14, 2007. (Seney Depos., 161-162; Ex. "4"). In his typewritten report, Seney described in detail his encounter with Officer Fitzgerald on April 13, 2007 at approximately 5:00 p.m. on the corner of State Street and 6th Avenue. (Id.). Seney described Fitzgerald as "extremely agitated and aggressive and stated he had been at ERT training all day and that [Seney] was the topic of discussion for the entire training day." (Id., p. 1). Seney reported that Fitzgerald told him the entire ERT team was angry with him and that "'members were spewing venom' and that [Seney's] personal safety was in jeopardy." (Id.). According to Seney's report, when he expressed disbelief that the entire team was angry with him, Fitzgerald called Sgt. Joe Centanni on his cell phone who confirmed that Seney was topic of discussion at the training session and that "things are in a very bad state and that he [Centanni] wouldn't be surprised if things did become physical." (Id.). After the conversation with Centanni ended, Fitzgerald told Seney things that could happen to him:

> (a) Seney's personal vehicle may be vandalized;
>
> (b) Officers would not back him up on police calls;
>
> (c) He'll be beat up;
>
> (d) Someone may call his wife and inform her that he has been involved in extramarital affairs; and
>
> (e) His home may be sprayed with an MP-5, an automatic weapon used by the ERT team.
>
> (Id.).

Seney reported in his statement that during the conversation he felt "increasingly panicked, shocked and sick and felt that his personal safety and the safety of his family were in jeopardy." (Id., p. 2). When he arrived at home that evening, he called Officer Chris McDonald, a friend whom he trusted, who was present at the ERT training session

that day.  McDonald confirmed that there was anger toward him by members of the ERT, but that he did not hear any of the threats reported by Fitzgerald.  (Id., p. 2).

After his conversation with McDonald, Seney received a call from Officer Kittle, a member of the ERT team who was on the Sergeant's list.  Kittle told Seney he was extremely angry with him, presumably for writing the anonymous letter, "but stated that he never made threats of spraying my house with an MP-5, and that he would never fail to back me up at work."  (Id., p. 2).  Kittle told Seney "the situation is already bad enough, and that he does not need an Internal Affairs Investigation on top of it."  (Id.).  A short time later, Seney received a call from Officer Fitzgerald who, Seney reported, told Seney that he was only "busting balls" and that the things he told him would never really happen.  (Id.).  Fitzgerald told Seney thought he could tell he was just "busting balls". However, Seney stated, Fitzgerald's "aggressive tone and vulgarities which he used at the time of our initial conversation did not set a tone of "busting balls".  (Id.).  Seney further stated in his typewritten report that when he reported for work on Saturday.  Seney also reported that on Saturday, April 14, 2007, there was a message on the South Troy substation bulletin board ("grease board") stating:  "There are Rats among us!  Be AFRAID."  And next to this were the initials "SS", which he believed to be his initials. (Id.).

On Monday morning, April 16, 2007, Tedesco received Seney's typewritten report and provided it to Chief Kaiser.  (Tedesco Depos. 58; Kaiser Depos., 14-15).  Later that day, Kaiser convened a meeting with Asst. Chiefs Tedesco and McAvoy, Capt. Sprague, head of the ERT team, and Capt. Paurowski, head of the Internal Affairs

Bureau. (Kaiser Depos., 13). Chief Kaiser discussed Seney's typewritten statement with those at the meeting and directed Capt. Paurowski to commence an Internal Investigation into the matter as soon as possible. (Id., 19). Capt. Sprague assured them there were no physical threats against Seney at the April 13 training session. (Id., 25). During the meeting, Kaiser made handwritten notes in the right margin of his copy of Seney's typewritten statement. (Id., 17)(Depos. Ex. "BB"). The first eight lines of marginalia were made immediately after the meeting with the Chiefs, Capt. Sprague and Capt. Paurowski. (Id., 20).

The remainder of his margin notes were made after a second meeting that day at approximately 4:00 p.m. with Asst. Chiefs Tedesco and McAvoy and Capt. Magnetto, Commander of Seney's shift. (Id., 20-21). Officer Seney was also interviewed during this second meeting. (Id., 22). Chief Kaiser described Seney as "visibly upset" and "on the verge of tears". (Id., 22-23). Asst. Chief McAvoy also testified that Seney was very emotional and on the verge of tears, choking on his words. (McAvoy Depos., 55-56). Chief Kaiser testified they were concerned for Seney and offered him counseling at the Employees' Assistance Program ("EAP") and gave him an EAP card for this purpose. (Kaiser Depos., 24)(See Depos., Ex. "10").

After Seney left, it was discussed that Chief Kaiser and the Asst. Chiefs would attend platoon role calls "to kind of calm things down", because the Seney-Fitzgerald matter "had become an issue within the department." (Id., 24). However, Capt. Magnetto thought this would tend to inflame things rather than calm them down and

recommend that each platoon commander address the matter with their respective shifts – which was decided.  (Id., 24).

Late Monday afternoon, Chief Tedesco received a call at home from Councilwoman Carolin Collier (Tedesco Depos., 78).  Collier told him the Mayor wanted to speak with Officer Seney regarding the threat issue.  Collier said she tried without success to reach Seney and asked Tedesco to contact him.  (Id.).  Tedesco reached Seney and conveyed Collier's message.  (Id., 80).  Seney asked Tedesco if it was okay to meet with the Mayor.  Tedesco advised him that the Mayor was the CEO of the City, "so if he wants to talk, then I suggest you do it."  (Id., 80).

Mayor Tutunjian recalled receiving a call on Monday from Councilwoman Carolin Collier who asked him to come to her house to discuss an important matter. (Tutunjian Depos., 35-36).  When he arrived at her home, at about 6:00 p.m., Officer Seney was there with Ms. Collier.  (Id., 38-39).  Officer Seney gave him a copy of his typewritten statement and they discussed it briefly.  (Id., 42-43; Depos. Ex. "4").  Officer Seney appeared upset and told Mayor Tutunjian how distressed his wife and family were. (Id., 43).   ("He was upset.  I could see it in his face and I could hear it in his voice."). He assured Officer Seney that he took this seriously and would look into it the next day at a scheduled meeting.  (Id., 43).  After he arrived home that evening, he read the report several times and called Brian Goldberger, the City's labor attorney.  (Id., 31-32; 43-44).

Unable to reach Goldberger, he left a message asking Goldberger to call him.  (Id., 31-32; 44-45).[5]

Attorney Goldberger called the Mayor early the next morning.  (Id., 32, 234).[6] Tutunjian discussed Seney's report with Goldberger, referring to specific portions (Id., 235; 244) and told Goldberger he intended to address it that morning at his meeting with the Chiefs.  (Id., 62).  He discussed with Goldberger what his options were, including putting Officer Fitzgerald on administrative leave.  (Id., 235).  Goldberger advised him that this was within his authority, if he felt it appropriate.  (Id., 235).   Goldberger also advised him to arrange for Seney to "sign" his report.  (Id., 84).[7]  Goldberg confirmed this conversation with Tutunjian stating he told the Mayor that with respect to criminal conduct, he should discuss it with the Chiefs.  ("If he's having a Chief's meeting, discuss it with law enforcement personnel (Goldberger Depos., 33).   Goldberger also testified they discussed "administrative leave" and he told the Mayor it was an option available to him.  (Id., 33-35; 53-54).

---

[5] Tutunjian's telephone record (Exhibit 32) confirms the call to Goldberger (469-0620) that evening at 9:37 p.m.  (Id., 233).

[6] Tutunjian's telephone record (Exhibit 32) confirms a call from Attorney Goldberger at 9:24 a.m. on 04/16/07, lasting 19 minutes.  (Id., 234).

[7] It's clear that what Goldberger advised the Mayor was to have Officer Seney swear to or verify his report. (See BG 47; DM 32-33; 37; JT 72-73 and SS 35-36).

**April 17, 2007 Meeting**

At the Mayor's April 17, 2007 meeting with Asst. Chiefs Tedesco and McAvoy, the Seney-Fitzgerald matter was discussed. (Kaiser Depos., 33-34).  Mayor Tutunjian said he had met with Officer Seney (Id., 147-148) and brought up the possible arrest of Officer Fitzgerald based upon Seney's allegations.  (Id., 39).

Asst. Chief Tedesco recalled the Mayor telling them he had spoken with Officer Seney the night before and was "outraged and embarrassed."  (Tedesco Depos., 107). Tedesco testified the Mayor "was concerned about the effect on the department that officers would be doing this to each other."  (Id., 107).  The Mayor's voice was "elevated and he was upset."; he said he didn't want another Virginia Tech on his hands in the City of Troy.  (Id.).

Both Chief Kaiser and Asst. Chief McAvoy advised the Mayor there wasn't enough for an arrest or for departmental charges. (Kaiser Depos., 39).[8]  McAvoy testified that Mayor Tutunjian accepted McAvoy's and Kaiser's advice, as he usually did. (McAvoy Depos., 138-139).[9]  Then the option of placing Fitzgerald on administrative leave was raised.  (Id., 140).  Chief Kaiser explained to the Mayor what administrative leave entailed, including that Fitzgerald would continue to be paid, with restrictions on

---

[8] According to Chief Kaiser, Asst. Chief Tedesco remained silent during the meeting, which was typical of him.  (Id., 39)("He was very quiet at these meetings.").

[9] McAvoy testified this was typical.  According to McAvoy, the Mayor always deferred to Chief Kaiser on disciplinary issues, including when Officer Fitzgerald's first amendment rights as PBA President were concerned.  (Id., 29-34; 40-41)("I don't remember a time when he thought he knew more about the law then the Chief did to discuss matters like that.")(Id., 32-33).

11

his working. (Id., 72; 140; McAvoy Affid., ¶ 18). Following this explanation by Kaiser, the Mayor stated this is what he wanted to do. (McAvoy Depos., 140).[10]

Neither Chief Kaiser, Asst. Chief Tedesco or Deputy Chief McAvoy objected. (Id., 141). McAvoy testified that since the Mayor and Chief Kaiser had reached a consensus about "administrative leave", McAvoy considered it a directive, since he and Asst. Chief Tedesco "were further down the food chain". (Id., 160-161).[11] Chief Kaiser testified that administrative leave was more palatable to him because the officer was not being disciplined and is not impacted financially and was preferable to a suspension with or without pay. (Kaiser Depos., 119-120).

At deposition, Chief Kaiser acknowledged that he considered the threat that Seney's fellow officers would not back him up on police calls to be a serious threat (Id., 46-48); and that he considered the threat that Seney's home may be sprayed with an MP-5 machine gun, also "a serious life-threatening threat." (Id., 53-54). Kaiser acknowledged Seney's report stated that Officers McDonald and Kittle told Seney that no such threats were made at the ERT training session that day, and that Officer Fitzgerald called him later Friday evening stating that he was only "busting balls" earlier when he conveyed the threats to Seney. (Id., 53). Kaiser testified he would consider the person who made such threats a danger to the operation of the Troy Police force. (Id., 55).

---

[10] Under departmental procedures, according to McAvoy, it was Chief Kaiser's responsibility to advise Officer Fitzgerald he was being placed on administrative leave and the basis for that decision. (Id., 32-33; 141-142).

[11] McAvoy didn't have a differing, unexpressed opinion at the time. (Id., 161).

Chief Kaiser and Deputy Chief McAvoy acknowledged that General Order 3.2 of the Troy Police Department (Depos. Ex. "49") authorized a superior to place an officer on administrative leave "when it appears that such action is in the best interest of the department." (Kaiser Depos., 57-58; McAvoy Depos., 142-143). Both acknowledged that this involved the exercise of discretion. (Kaiser Depos., 58-59; McAvoy Depos., 143).

After things were decided at the meeting, Tutunjian asked Corporation Counsel David Mitchell to come into the meeting at which time Mitchell was advised of their decision and was instructed to prepare an order accordingly. (Tutunjian Depos., 102-103). Mitchell recalled that within a few minutes of his arrival, Chief Kaiser asked Mitchell: "Can we have these officers examined." (Mitchell Depos., 44). Mitchell responded: "You can have any officer examined so long as you comply with the terms of the statute, the Civil Service statute, and the PBA Contract ... but check with Goldberger on whoever you're going to have examined...". (Id., 44-45). Mitchell recalled further discussion about a possible criminal investigation at which time Mitchell suggested, if that were decided, to send Seney's statement to Loudonville for an investigation by the State Police, which seemed to upset McAvoy, and was rejected by the Mayor. (Id., 46-47).[12]

At this time, Chief Kaiser and Mayor Tutunjian told Mitchell what they wanted him to do, with Kaiser doing most of the talking. (Id., 241): "Place Officer Fitzgerald on paid administrative leave and the other bullets on his April 17, 2007 e-mail. (Id., 50)(see

---

[12] "Dave, we're handling this in-house ... I just need you to prepare an Order for me." (Mitchell Depos., 47).

Depos., Ex. "28").  No one expressed any disagreement with what had been decided, including putting Officer Fitzgerald on administrative leave.  (Id., 241-242).  Mitchell emphasized that "never did anybody talk about residency, ever ever ever.  It never came up.  It was never discussed."  (Id., 228).  Asst. Chief McAvoy made the same observation. (McAvoy Affid., ¶ 25).  The Mayor's "only stated interest was the safety of Officer Seney and his family and the stability of the Police Department. (Id., ¶ 35).

Mayor Tutunjian confirmed that at the April 17, 2007 meeting, he was advised that an Internal Investigation had been ordered.  (Id., Ex. "A", Tutunjian Depos., 80).  He was relieved to learn this but wanted more immediate action to defuse the situation and allow everyone to cool down.  (Id., 80-81).  He contemplated that the administrative leave would last until the Internal Affairs Investigation was completed.  (Id., 239).  It was his intention to abide by the determination of the Internal Affairs Investigation.  (Id., 239).

**First Claim – First Amendment Retaliation**

Judicial consideration of a First Amendment Retaliation Claim requires application of the analytical framework established by the Supreme Court in Pickering,[13] Connick,[14] and Garcetti.[15]  First, the Court must determine whether the employee speaks pursuant to his official duties; if so, the speech is not constitutionally protected and the inquiry ends.  Garcetti at 421; Weintraub v. Board of Education, 593 F.3d 196, 201; 203 (2 Cir., 2010); Herdman v. Hogan, 2011 WL 4566333, ** 2-3 (N.D.N.Y.)(Sharpe, D.J.).  Second, if the employee does not speak pursuant to his official duties, but speaks as a citizen, the Court must then determine whether the subject of the speech is a matter of public concern, rather than private or personal concern.  Pickering at 568; Connick at 147; and Garcetti at 418.  If it is not, then the speech is not protected and the inquiry ends.  (Id.).  Lewis v. Cowen, 165 F.3d 154, 163 (2 Cir., 1999).  Third, if the employee speaks as a citizen on a matter of public concern, the Court must determine whether the employee's interest outweighs that of the public employer.  Pickering at 568; Garcetti at 418.  Fourth, if the employee's interest outweighs that of the public employer, the employee must further demonstrate that his speech was (a) a substantial or a motivating factor, (b) in an adverse employment action.  Cotarelo v. Vill. of Sleepy Hollow Police Dept., 460 Fed.3d 247, 251 (2 Cir., 2006); Anemone v. Metropolitan Trans. Auth., 629 F.3d 97, 114 (2 Cir., 2011).

---

[13] Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563 (1968).

[14] Connick v. Meyers, 461 U.S. 138 (1983).

[15] Garcetti v. Ceballos, 547 U.S. 410 (2006).

Where the plaintiffs allegedly protected conduct is a "unitary event", i.e., where, as here we submit, the government action was concededly in response to plaintiffs' conduct and could prompt either a permissible or impermissible reason for defendant's action, retaliation claims "require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to plaintiff's conduct." Anemone v. Metropolitan Trans. Auth., supra., at 114; Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Dev. Agency, 77 F.3d 26, 33 (2 Cir., 1996). It is the plaintiff who bears the initial burden of showing that an improper motive played a substantial part in defendant's action. Anemone, supra., at 114; Scott v. Coughlin, 344, F.3d 282, 288 (2 Cir., 2003).

Finally, if plaintiff establishes that an adverse employment action was motivated in part by protected speech, the defendant can avoid liability upon showing that it would have taken the same adverse action in the absence of the protected speech. Mt. Healthy Cty. Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1972); Heil v. Santoro, 147 F.3d 103, 109 (2 Cir., 1998); Anemone, supra., at 114.

**a.**

The record establishes, as a matter of law, that the only speech or activity proximal to Fitzgerald being placed on administrative leave occurred on April 13, 2007: (a) his brief conversation with Asst. Chief Tedesco in the afternoon of April 13, 2007 (see O'Connor Aff., Depos. Ex. "H", 83-92); and his extended conversation with Officer

Seney later that day. (Id., 94-129). It is submitted that both conversations were part-and-parcel of plaintiff's core job responsibilities as a police officer and/or a PBA officer.

Plaintiff acknowledged that his visit to Asst. Chief Tedesco's office that day was to report his apprehension of potential violence involving certain members of the ERT team. (Id., 86). He was concerned about Officer Seney's physical safety and felt a responsibility to report the problem to Asst. Chief Tedesco. (Id., 83-84)("I did. I felt the responsibility to report it. Yes."). Plaintiff only spoke to Asst. Chief Tedesco, his superior, about his apprehension of physical violence, no one else. (Id., 91-92). Plaintiff had attended ERT training that day, was wearing his battle dress uniform and his report to Asst. Chief Tedesco was based upon activities intimately associated with his employment with the City of Troy. Consequently, this conversation was indisputably job-related and not constitutionally protected. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006), Weintraub v. Bd. of Education, 593 F.3d 196, 202-203 (2 Cir., 2010); see also, Huth v. Haslun, 598 F.3d 70, 74 (2 Cir., 2010), Kiehle v. Cty. of Cortland, 2011 WL 2680713, ** 4-5 (N.D.N.Y.); Paola v. Spada, 372 Fed.Appx. 143, 144 (2 Cir., 2010); Matthews v. Lynch, 2011 WL 1363783, ** 3-4 (D. Conn.).

It is also clear, as a matter of law, that plaintiff's extensive conversation with Officer Seney later on April 13, 2007 was also inherently related to plaintiff's employment duties with the City of Troy. In that conversation, plaintiff and Seney discussed anger expressed by certain officers at the ERT training that day. (Id., 99-103); Seney's concern for his safety in the face of his colleagues' anger (Id., 119-120); his concern that officers would not back him up, because, as reported by Fitzgerald to Seney,

they complained that he didn't back up officers or failed to respond promptly to calls (Id., 110-113); threats reported to Seney by Fitzgerald that someone might anonymously report extramarital affairs to his wife; (Id., 113-114); Seney's complaint of not being properly used as a canine officer (Id., 118-118); and not sleeping or eating properly as a result of stress over the anonymous letter controversy.   (Id., 120-121).   Garcetti v. Ceballos, 547 U.S. 410, 421 (2006), Weintraub v. Bd. of Education, 593 F.3d 196, 202-203 (2 Cir., 2010); see also, Huth v. Haslun, 598 F.3d 70, 74 (2 Cir., 2010), Kiehle v. Cty. of Cortland, 2011 WL 2680713, ** 4-5 (N.D.N.Y.); Paola v. Spada, 372 Fed.Appx. 143, 144 (2 Cir., 2010); Matthews v. Lynch, 2011 WL 1363783, ** 3-4 (D. Conn.).

### b.

In assessing whether an employee's speech addresses a matter of public concern, the Court must consider "the content, form and context of a given statement as revealed by the whole record." Connick v. Meyers, 461 U.S. 138, 147-148 (1983); Lewis v. Cowen, 165 F.3d 154, 163 (2 Cir., 1999).   It's clear that the conversation(s) which precipitated the plaintiff's administrative leave involved only an intramural dispute arising out of an anonymous letter sent to the Civil Service Commission identifying candidates on the Sergeant's List who were in violation of the local ordinance.   Officer Seney was suspected of being the author of the letter and the uproar and animosity which became the subject of Fitzgerald's April 13, 2007 conversations with Asst. Chief Tedesco and Officer Seney were the direct product of that suspicion.   Consequently, the speech and the activity which became the subject of Mayor Tutunjian's consideration and review, resulting in the plaintiff's administrative leave was, in essence, a departmental problem, which was addressed within the City administration.   It had neither the

characteristics nor pretensions of a more public issue.   It required and received, appropriate attention by Mayor Tutunjian and the Police Chiefs on April 17, 2007; neither the intensifying squabble, nor plaintiff's speech relating to it, were, in the legal sense, broader matters of public concern.   <u>Pickering</u> at 568; <u>Connick</u> at 147; and <u>Garcetti</u> at 418.   <u>Cobb v. Pozzi</u>, 363 F.3d 89, 102-103 (2 Cir., 2004); <u>Ruotola v. City of New York</u>, 514 F.3d 184, 189-190 (2 Cir., 2008); <u>Fusco v. City of Rensselaer</u>, 2006 WL 752794, * 8 (N.D.N.Y.) and <u>Williams v. County of Nassau</u>, 2011 WL 1240699, * 3 (E.D.N.Y.).

### c.

Even if it is assumed that the speech and activity in question was not part and parcel of plaintiff's employment related duties and was a matter of public concern, the undisputed facts in this record reveal that the plaintiff's speech was being – and would continue to be - disruptive of the operations of the police department; and the actual and potential disruption clearly outweighed any First Amendment value of plaintiff's speech. A public employer may take an adverse employment action against an employee even when speaking as a citizen on a matter of public concern where:

1.   the employer's apprehension of disruption is reasonable;

2.   the potential disruption outweighs the value of the speech; and

3.   the employer's action was based on this potential disruption, and not in retaliation for the speech.

<u>Waters v. Churchill</u>, 511 U.S. 661, 673 (1994); <u>Jeffres v. Harleston</u>, 52 F.3d at 9, 13 (2 Cir., 1995), cert. dn. 516 U.S. 862 (1995).

Accordingly, a public employer may even terminate an employee for disruptive speech, even though constitutionally protected, based upon a reasonable belief of what the employee said, regardless of what was actually said. Waters v. Churchill, supra., at 667-668; Jeffres v. Harleston, 52 F.3d at 10. Further, in weighing the value of the employee's speech against the interference with government operations, a public employee need only show that the speech was likely to be disruptive. Waters v. Churchill, supra., at 673; Jeffres v. Harleston, supra., at 10. Consequently, the First Amendment does not require a municipal employer to tolerate speech or activity which is reasonably believed to disrupt the work place, undermine the employer's authority or destroy close working relationships. Connick v. Meyers, 461 U.S. 138, 154 (1983); Waters v. Churchill, supra., at 673; Jeffres v. Harleston, supra., at 10; 13; Lewis v. Cowen, 165 F.3d 154, 162 (2 Cir., 1999). Further, our Federal Courts have acknowledged that a police department has a more significant interest than a typical government employer in regulating the speech activities of its employees, "in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence." Gordon v. Town of Hunter, 196 WL 77391, * 13 (N.D.N.Y.); Belch v. Jefferson County, 108 F.Supp.2d 147-148 (N.D.N.Y., 2000); Pappas v. Guiliani, 118 F.Supp.2d 443, 447 (S.D.N.Y., 2000); Spetalieri v. Kavenaugh, 36 F.Supp.2d 92, 106 (N.D.N.Y., 1998); Kelly v. Johnson, 425 U.S. 238, 246 (1976). In this case, Mayor Tutunjian's reasonably concluded that Officer Seney's report of moral threats in his April 13, 2007 conversation with Officer Fitzgerald was genuine and presented a serious issue of safety to the Seney family and disruption within the department. Under the controlling judicial authority, supra., Mayor Tutunjian was authorized to take the measured step of placing Officer Fitzgerald on administrative leave

at full pay and the other strictures that routinely accompany that status. The limited First Amendment interest presented by plaintiff Fitzgerald's speech, if any, did not require Mayor Tutunjian to tolerate conduct he reasonably would continue to disrupt the operations of the police department and destroy the close working relationships essential to its operation. Connick v. Myers, 461 U.S. 138, 154 (1983); Cobb v. Pozzi, 352 F.3d 79, 91 (2 Dept., 2003).

### d.

Even assuming Mayor Tutunjian acted partly based upon an improper retaliatory motive based upon plaintiff Fitzgerald's protected speech – a generous assumption – any reasonable jury would determine on this record that Officer Fitzgerald would have been placed on administrative leave by Mayor Tutunjian with its accompanying strictures, absent any such motive. Crawford-El v. Britton, 523 U.S. 575, 592-593 (1988); Locurto v. Safir, 264 F.3d 154, 166 (2 Cir., 2001); Cobb v. Pozzi, 363 F.3d 89, 102 (2 Cir., 2004); Hartford v. County of Broome, 102 F.Supp.2d 85, 99-100 (N.D.N.Y., 2000); Belch v. Jefferson County, 108 F.Supp.2d 143, 151 (N.D.N.Y., 2000); Cunningham v. N.Y. State Dept. of Labor, 2010 WL 1781465, ** 9-10 (N.D.N.Y.); Cotarelo v. Vill. of Sleepy Hollow Police Dept., 470 F.3d 247, 253 (2 Cir., 2006).

### e.

Finally, the measures taken by Mayor Tutunjian, as a matter of law, would not deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. Zelnick v. Fashion Inst. of Tech., 46 F.3d 217, 225-226 (2 Cir.,

2006); <u>Redd v. N.Y. State Div. of Parole</u>, 2010 WL 117452, * 14 (E.D.N.Y.); <u>Brady v. Damner</u>, 573 F.Supp.2d 712, 730 (N.D.N.Y., 2008).


**Second Claim – First Amendment Retaliation**

This claim appears to allege interference with plaintiff's First Amendment right of expressive association.  However, a public employee bringing this form of claim must establish the same elements as a First Amendment Retaliation Claim based upon speech, including that the associational conduct at issue touches upon a matter of public concern. <u>Cobb v. Pozzi</u>, 363 F.3d 89, 102-103; 105-107 (2 Cir., 2004); <u>Piscotano v. Murphy</u>, 511 F.3d 247, 253 (2 Cir., 2007); and <u>Prestopnik v. Whalen</u>, 204 WL 1576727, * 2 (N.D.N.Y.).  Consequently, we respectfully advance all of the points raised, <u>supra</u>., with respect to the first claim in opposition to plaintiff's second claim.


Further, there are blunderbuss allegations in this claim with respect to unspecified union activities and the grievance process.  It must be said that not all speech related to union activity is constitutionally protected speech. <u>Heil v. Santoro</u>, 1997 WL 102451, * 5 (S.D.N.Y.), aff'd. 147 F.3d 103 (2 Cir., 1998).  The Supreme Court and our Circuit Court have recognized that while the First Amendment "invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance'." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 420 (2006); <u>Connick v. Myers</u>, 461 U.S. 138, 154 (1983); <u>Cobb v. Pozzi</u>, <u>supra</u>.; <u>Weintraub v. Bd. of Ed. of City of New York</u>, 593 F.3d 196; 203 (2 Cir., 2010); <u>Borough of Duryea v. Guarnieri</u>, 131 S.Ct. 2488, 2496-2497 (2011).

Clearly, the allegations within the second claim with respect to the administration's refusal to participate in a grievance process and attempting to make plaintiff less effective a PBA leader do not rise to a constitutional level.  Their facial implausibility requires their summary dismissal.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Igbal, 556 U.S. 662 (2009).  Also, to the extent any alleged conduct occurred prior to April 15, 2007, any such claim is barred by the three year statute of limitations applicable to § 1983 actions in the State of New York.  Owens v. Okure, 488 U.S. 235, 249-251 (1989).  Finally, the record clearly reflects that the plaintiff's administrative leave in no way inhibited his work on behalf of the PBA.  (Fitzgerald Depos., 220-240, Depos. Ex. "WWW", "XXX", "YYY", "ZZZ" and "AAA").

### Third Claim – First Amendment Retaliation

This claim on behalf of the PBA was first asserted in the Amended Complaint filed December 30, 2010.  Consequently, we respectfully submit that the claim is barred by the three year statute of limitations.  In addition, the claim alleges, in conclusory form, that the defendants are liable for expenditures incurred in the Article 78 proceeding instituted on behalf of the plaintiff on April 24, 2007; and also alleges defendants' responsibility for expenses caused by the City's refusal to participate in the grievance process since late 2006-2007.  We respectfully submit that these allegations are conclusory, facially implausible and fail to rise to the level of any constitutional claim.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Igbul, 556 U.S. 662 (2009)  Finally, because of its purport as a First Amendment Retaliation Claim, it is

subject to all of the defenses and arguments advanced with respect to the first claim alleged in the Amended Complaint, which we do assert at this time.

### Fourth Claim – Property Interest

The plaintiff's fourth claim alleges that plaintiff was deprived of a constitutionally protected property right without due process of law.   (Docket No. 39, Amended Complaint, ¶¶ 122-127).   In order to establish a *prima facie* claim under this rubric, a plaintiff must demonstrate that (a) he possessed a constitutionally protected property interest; (b) State action has deprived him of that interest; (c) without due process. Board of Regents v. Roth, 40 U.S. 564, 569; Cleveland Board of Educ. v. Loudermill, 470 U.S. 532, 538 (1985).   Admittedly, the property interest of a public employee who may only be discharged for cause, is a constitutionally protected property interest under the Fourteenth Amendment.    Cleveland Board of Educ. v. Loudermill, supra. at 542; O'Connor v. Pearson, 426 F.3d 187, 196 (2 Cir. 2005); Taravella v. Town of Wolcott, 589 F.3d 129, 134 (2 Cir.); Ciamriello v. County of Nassau, 292 F.3d 307, 313 (2 Cir. 2002).

However, the law was clearly established in the Second Circuit in 2007 - and presently - that an employee who continues to be paid by his employer cannot sustain a 1983 claim for deprivation of property without due process of law. O'Connor v. Pierson, 426 F.3d 187, 199-200 (2 Cir. 2005)("[N]o Court has held that an employee on fully paid leave has been deprived of a property right merely by virtue of being relieved of his job duties.");  Piscottano v. Murphy, 511 F.3d 247, 288 (2 Cir. 2007)("Scapini suffered no loss of employment, no demotion, no loss of salary, no loss of benefits.  In short, Scapini

adduced no evidence that the application of Directive 2.17 to him deprived him of any property. His due process challenge to Directive 2.17 was properly dismissed.") Further, District Courts within the Second Circuit have uniformly followed this standard: Pearlman v. Cooperstown Central School Dist., 2003 WL 23723827, *3 (N.D.N.Y.); (School Board did not deprive plaintiff of a protected property interest when it suspended him with pay for two years.); Thomas v. Board of Education, 2011 WL 1225972, **9-10 (E.D.N.Y.); (Tenured public school teachers who were relieved of duties with no loss of salary or benefits have no due process claim.); Deal v. Seneca County, 2008 WL 2020004, *3 (W.D.N.Y.); ("The law of this Circuit provides that nothing less than suspension without pay constitutes a protected property interest."); Adams v. New York State Educ. Dept., 752 F.Supp.2d 420, 453 (S.D.N.Y. 2010); Ramberran v. Dellacona, 2008 WL 905217, *4 (E.D.N.Y.)("An employee who continues to be paid by his employer cannot sustain a claim for deprivation of property without due process.); Ware v. City of Buffalo, 186 F.Supp.2d 324, 334 (W.D.N.Y. 2001)("He was suspended briefly, and his full-time employment was not terminated. Not every grievous loss visited upon a person by the State is sufficient to invoke the procedural protection of the due process clause.")(interior quotation marks omitted); Cooper v. Connecticut Dept. of Corr., 2010 WL 4345715, ** 9-10 (D. Conn.)(Placing Mr. Cooper on paid administrative leave pending an inquiry into his fitness to remain in his position was a reasonable enforcement of pre-existing disciplinary policy. The internal inquiry was prompted by "statements that might well be considered threats or warnings of violence.").[16] In this case, plaintiff was undisputedly suspended with pay. Consequently, based upon this controlling case

---

[16] This Second Circuit jurisprudence respects the guiding dictum of the Supreme Court in Cleveland v. Board of Education v. Loudermill, supra., where the Court, in evaluating the constitutional validity of terminating a public employee without a hearing, stated: "Finally, in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay." (at 444-445).

law, the plaintiff's claim of a deprivation of a constitutionally protected property interest cannot be sustained.

### Fifth Claim – Liberty Interest

Plaintiff's fifth claim alleges that plaintiff was deprived of a constitutionally protected liberty interest, i.e., plaintiff's good name and employment, without due process. (Docket No. 39, Amended Complaint, ¶¶ 129-133). A constitutional due process claim of this nature, commonly referred to as a "stigma-plus" claim requires a plaintiff to establish:

1.  A stigmatizing statement that calls into question plaintiff's good name. Patterson v. City of Utica, 370 F.3d 322, 329-330;

2.  The public dissemination of the stigmatizing statement. (Id.);

3.  That the stigmatizing statement or statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment. (Siegel v. City of New York, 459 F.3d 207, 213 (2 Cir, 2006).

4.  A lack of adequate process (Valmonte v. Bane, 18 F.3d 992, 1002 (2 Cir. 1994).

Damage to one's reputation is not by itself sufficient to invoke the procedural protection of the due process clause. Paul v. Davis, 424 U.S. 693, 701 (1976). Consequently, for a procedural due process claim based upon deprivation of a protected liberty interest to survive summary judgment, plaintiff must demonstrate both a stigma and some other independent deprivation, customarily dismissal from public employment or demotion, in order to rise to the level of a protected liberty interest. Valmonte v. Bane, 18 F.3d 992, 999 (2 Cir. 1994); Paul v. Davis, supra. at 709; Codd v. Veger, 429 U.S. 624, 628 (1977).

In this case, it is not disputed that plaintiff's employment with the City of Troy was not terminated, it was continued with full pay during his brief administrative leave of seventeen (17) days.  Consequently, plaintiff did not sustain the required "significant alteration of [his] employment status" to satisfy the "plus" requirement of the standard. Patterson v. City of Utica, 270 F.3d 322, 322 (2 Cir. 2004)(Plaintiff rehired two weeks after being terminated did not establish "stigma plus", even if he was taken off the payroll, because "his time off the job is more analogous to a suspension."; Dobosz v. Walsh, 892 F.2d 1135, 1140 (2 Cir. 1989)(Plaintiff reinstated after 5 months suspension without pay did not suffer "a related alteration of his legal status" to give rise to a protected liberty interest."); Fehlhaber v. Board of Ed. of Utica Sch. Dist., 2010 WL 4386936, **2-3 (N.D.N.Y.)(Permanent employee suspended pending a § 75 hearing but never discharged or significantly demoted cannot satisfy the "plus" requirement.").

The plaintiff alleges that the defendants "embarked on a campaign to humiliate, embarrass, and defame him in connection with [his] suspension … including the publication of the acts taken against plaintiff to stigmatize him."  (Docket No. 39, Amended Complaint, ¶ 129); and that the defendants publicly stated that "plaintiff had threatened a fellow Police Officer, needed to see a mental health professional and [likened] him to the Virginia Tech shooter". (Id., ¶ 130).  These are gross misstatements of fact.  There is no evidence that Mayor Tutunjian – or any defendant - published or authorized anyone else to publish false factual information regarding the plaintiff's administrative leave or the Internal Investigation or the scheduled psychological examination.  Annexed to the Amended Complaint as Exhibit "G" is a copy of an April 19, 2007 article in the Albany *Times Union* which quotes Officer Fitzgerald as stating

that he was not told why he was placed on leave or how long it would last, and stating he was placed on administrative leave for informing the Assistant Chief of Police of a potential for workplace violence. Mayor Tutunjian's only response, an accurate one, was that Officer Fitzgerald "was not placed on administrative leave for informing the Chief of potential workplace violence." (Id.)(see Tutunjian Depos., 130-131). The Mayor also stated that Internal Affairs was conducting an investigation concerning Officer Fitzgerald, which was true. These accurate remarks cannot form the basis for plaintiff's liberty interest claim. Hennigan v. Driscoll, 2009 WL 3199220, **6-8 (N.D.N.Y.); Marinaccio v. Boardman, 2005 WL 928631, *20 (N.D.N.Y.).

Also annexed to the Amended Complaint as Exhibit "E" is a copy of Mayor Tutunjian's May 4, 2007 release to the press. This statement accurately summarized Officer Seney's allegations, the preliminary finding exonerating Officer Fitzgerald and his immediate return to active duty. The Mayor also reported his abiding concern with respect to the sergeant's list controversy which had not yet been resolved. It is submitted that there is nothing false or stigmatizing about the Mayor's press release. Significantly, the press release is contemporaneous with Officer Fitzgerald's exoneration and return to active duty, the antithesis the essence of a deprivation of liberty due process claim, namely, a stigmatizing statement accompanying plaintiff's termination. Consequently, since the defendants were not responsible for publishing any stigmatizing information about the plaintiff, which accompanied or was in close proximity to any judicially recognized liberty deprivation, this claim must be dismissed. Vega v. Lantz, 596 F.3d 77, 82 (2 Cir. 2010); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446.

**Plaintiff Received All The Process That Was Due**

Even if plaintiff could establish the deprivation of a constitutionally protected property or liberty interest, the claims would still fail because plaintiff was provided all the process that was due under the circumstances.   Indisputably, plaintiff was not discharged from public employment on April 17, 2007; rather, his employment was continued but he was relieved of his duties with full pay, pending the results of an Internal Investigation.  (Tutunjian Depos., 239).

At the Chiefs' Meeting on April 16, 2007, Chief Kaiser ordered Capt. Paurowski to immediately initiate an Internal Investigation.  (Kaiser Depos., 14).   Kaiser told Paurowski "to get on this as soon as possible, that it's an important case."  (Id., 19). Accordingly, Paurowski interviewed Officer Fitzgerald the next morning, April 17, 2007 as the first witness in the investigation.  (Paurowski Depos., 74; Depos. Ex. "J").  Prior to the interview, Capt. Paurowski advised Officer Fitzgerald that he was conducting an official investigation:

> 5.  Into a report filed by Officer Steve Seney on April 15, 2007 where he states that he had a conversation with you, Officer Fitzgerald, where you informed him that several members of the ERT team made threats against Officer Seney's safety and that these threats stem from an ongoing dispute over an alleged letter sent to the Troy City Counsel [sic] involving members currently on the promotional list for Sergeant).
>
> (Depos. Ex. "J").

At the end of the interview, Officer Fitzgerald was also asked if there was anything about the investigation that he felt had not been covered and that he had an opportunity at that time to make a statement.  (Id., Depos. Ex. "J").

On April 24, 2007, an Article 78 Proceeding, by Petition and Order to Show Cause, was commenced by plaintiff Fitzgerald which resulted in the immediate rescission of the scheduled psychological exam as well as plaintiff's banishment from the public safety building, so that he could conduct union business. (see Depos. Ex. "25": April 24, 2007 Order to Show Cause with Temporary Restraining Order). The psychological exam was never re-scheduled. (Tutunjian Depos., 146).

On May 1, 2007, Attorney Brian Goldberger, the City's Labor Attorney, met with Capt. Paurowski who advised him the Internal Investigation was wrapping up and that "he didn't find any evidence to substantiate any allegations against Officer Fitzgerald." (Goldberger Depos., 86-87; 89). Goldberger advised Mayor Tutunjian of his conversation with Paurowski. (Id., 88-89). On May 4, 2007, Mayor Tutunjian instructed Chief Kaiser to return Officer Fitzgerald to active duty effective Monday, May 7, 2007. (Tutunjian Depos., 239-240; Depos. Ex. "34" and "GG"). Subsequently, the Article 78 proceeding commenced April 24, 2007 (see Depos. Ex. "25") was discontinued by mutual consent on the ground that the matter was moot after Officer Fitzgerald was returned to active duty. (Kremer Depos., 43).

It is submitted that based upon this record, as a matter of law, plaintiff was provided all the process that was due under the circumstances. Consequently, plaintiff's property and liberty interest due process claims must fail on this basis alone. Locurto v. Safir, 274 F.3d 154, 175 (2 Cir., 2001)("An Article 78 proceeding therefore constitutes a wholly adequate post-deprivation hearing for due process purposes."); see also, Segal v.

City of New York, 459 F.3d 207, 214 (2 Cir., 2006); St. Louis v. N.Y. City Health & Hosp. Corp., 682 F.Supp.2d 216, 237-238 (E.D.N.Y., 2010); Spang v. Katonah-Lewisboro Union Free Sch. Dist., 626 F.Supp.2d 389, 397 (S.D.N.Y., 2009).

### Conspiracy Claims

Plaintiffs allege a conspiracy among the individual defendants to deprive plaintiffs of various constitutional rights under the first through the eighth claims in the Amended Complaint.  The defendants respectfully submit that **(a)** the allegations in the Complaint do not adequately or plausibly allege any conspiracy; **(b)** a conspiracy claim against these defendants is precluded by the "intra-corporate conspiracy" doctrine; **(c)** plaintiff's seventh claim alleging a Section 1985 (3) civil rights conspiracy is fatally defective for the additional reason that neither plaintiff qualifies as a member of a group designed to be the beneficiary of the constitutional remedy provided by Section 1985 (3) and neither can establish any racial or otherwise class-based invidious discriminatory animus as required; and **(d)** absent an underlying constitutional violation a conspiracy claim may not be maintained.

### a.

There is no proof of a conspiracy within the allegations of plaintiff's Complaint. To support a Section 1983 conspiracy claim, a plaintiff must establish:

(1)    an agreement between two or more state actors;

(2)    to act in concert to inflict an unconstitutional injury; and

(3)    an overt act done in furtherance of that goal causing damages.

Pangburn v. Culbertson, 200 F.3d 65, 72 (2 Cir., 1999).  Moreover, whereas here, the complaint and deposition testimony contain only conclusory, vague or speculative

allegations of conspiracy, these allegations are appropriately dismissed.   <u>Ciambriello v.</u> <u>County of Nassau</u>, 292 F.3d 307, 325 (2 Cir., 2002); <u>San Filippo v. U.S. Trust Co. of</u> <u>N.Y.</u>, 737 F.2d 246, 256 (2 Cir., 1984).

**b.**

Further, even if plaintiffs' allegations were found to be more than conclusory, plaintiffs' conspiracy claims are barred by the "intra-corporate conspiracy" doctrine, which provides that officers, agents or employees of a single corporate entity are legally incapable of conspiring together.   <u>Herman v. Moore</u>, 576 F.2d 453, 459 (2 Cir., 1978), cert. dn. 439 U.S. 1003 (1978); <u>Girard v. 94th St. & 5th Ave. Corp.</u>, 530 F.2d 66, 70 (2 Cir., 1976); <u>Hartline v. Gallo</u>, 546 F.3d 95, fn. 3 (2 Cir., 2008).   This doctrine applies to public entities and their employees.   <u>Lee v. City of Syracuse</u>, 613 F.Supp.2d 417, 442 (N.D.N.Y. 2009); <u>DeMeo v. Kean</u>, 754 F.Supp.2d 435, 446 fn. 3 (N.D.N.Y. 2010); <u>Gillard v. Rovelli</u>, 210 WL 4905240, * 15 (N.D.N.Y.); and <u>Freeman v. Santos</u>, 2010 WL 982893, * 3 (N.D.N.Y.).

**c.**

Plaintiffs' Seventh Claim alleging a Section 1985(3) conspiracy is fatally defective for an additional reason.   In order to establish a viable claim under § 1985(3), plaintiff must establish some racial, or otherwise class based, invidious discriminatory animus behind the conspirator's actions.   <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 102 (1971).   Under this standard "class-based animus" encompasses "only those groups with discrete immutable characteristics such as race, national origin and sex".   (<u>Id.</u>); <u>Martin v.</u> <u>NYS Dept. of Correctional Services</u>, 115 F.Supp.2d 307, 316 (N.D.N.Y. 2000)(Smith,

N.J.); <u>Williams v. Calidonna</u>, 2008 WL 4693160, * 9 (N.D.N.Y. 2008)(Herd, J. adopting RR by Treece, M.J.); <u>Willis v. Nally</u>, 2009 WL 1044595, * 7 (N.D.N.Y. 2009)(Hurd, D.J., adopting the Report-Recommendation of M.J. Treece).   Northern District jurisprudence has uniformly held that § 1985(3) should not be extended beyond racial boundaries unless a class has been afforded suspect or quassi-suspect classification or when Congress has provided the class special protection.   <u>Martin v. NYS Dept. of Correctional Services</u>, <u>supra</u>., at 316; <u>Ryan v. City of Watertown</u>, 1998 WL 709798, * 8 (N.D.N.Y. 1998); <u>Graham v. City of Albany</u>, 2009 WL 4263510, * 12; <u>Carter v. City of Albany</u>, 2007 WL 913923, * 4 (N.D.N.Y.).  Suffice it to state that neither plaintiff falls within a class that qualifies under this standard for relief pursuant to Section 1985(3). This claim, therefore, must fail for this independent reason as well.

### d.

Finally, since plaintiffs have not established an underlying constitutional violation, they may not maintain a claim for conspiracy.  <u>Curley v. Village of Suffern</u>, 268 F.3d 65, 72 (2 Cir., 2001); <u>Singer v. Fulton County Sheriff</u>, 63 F.3d 110, 119 (2 Cir., 1995).

### Sixth Claim – Privacy

Plaintiff testified that when he was permitted back into the building on April 25, 2007, for two or three days an officer was assigned to monitor his presence while in the building.  (Fitzgerald Depos., 174; 185).  While he was in the PBA office, the officer remained outside the door.  (Fitzgerald Depos., 176-177).

According to Chief McAvoy, the monitoring of Officer Fitzgerald's presence in the public safety building was at the direction of Attorney Goldberger. (McAvoy Affid., ¶¶ 30 and 33). McAvoy testified that it was not an uncommon practice, on a case by case basis, when an officer is placed upon administrative leave to have him escorted while in the public safety building. (McAvoy Depos., 89-92). The Mayor was not involved in the decision to monitor Officer Fitzgerald's presence in the public safety building. (Tutunjian Depos., 150). He was informed later on of this but was unaware of it at the time (Id.); nor was Tedesco aware of the monitoring (Tedesco Depos., 132); nor is there any evidence that David Mitchell was aware of it.

At any rate, it is settled that mere surveillance without a showing of illegality and cognizable injury does not give rise to an action for rights guaranteed under the First Amendment. Laird v. Tatum, 408 U.S. 1, 13 (1972); 5th Avenue Peace Parade Comm. v. Gray, 480 F.2d 326, 331 (2 Cir., 1973). Recently, in U.S. v. Jones, 132 S.Ct. 945 (2012), the Supreme Court, holding that the use of a tracking device to monitor the movement of a vehicle was a search, reaffirmed the judicial understanding that "mere visual observation does not constitute a search." (at 953).

Here, the plaintiff had no expectation of privacy in the public areas of the police station. Maryland v. Macon, 472 U.S. 473, 479 (1985). This would include the men's room, frequented by other officers in the department. U.S. v. Gratta, 104 F.3d 350 (2 Cir., 1996). Consequently, where there was no "search" and no "seizure", within the meaning of the Fourth Amendment, a substantive due process analysis is appropriate. County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998). However, substantive due

process is violated only where government conduct "shocks the conscious" (Id. at 846-847), indisputably, not the case here. Malay v. City of Syracuse, 2011 WL 4595201, * 9 (N.D.N.Y.).  Consequently this claim, as well, must be dismissed.

### Ninth Claim – Fair Labor Standards Act

Plaintiff alleges that, although he worked April 16 and part of April 17, 2007 he was not paid for his work on those days on Friday, April 20, 2007 when his paycheck was due (Amended Complaint, ¶¶ 147-151), but, as he testified, he eventually did receive his wages. (Fitzgerald Depos., 185-186).  He further testified that when he did not receive his paycheck, he did not call anybody at the police station regarding his paycheck and was unable to explain why not.  (Id., 186-187).  Plaintiff was permitted back in the police station on April 25, 2007, but could not recall if he received his paycheck on Friday, April 27, 2007.  (Id., 188).  It is respectfully submitted that, on this record, plaintiff has failed to establish a *prima facie* claim under the Fair Labor Standards Act.

It is also submitted that, even if a claim were demonstrated *prima facie*, it accrued at the time plaintiff alleges the City failed to pay him his required compensation and is subject to a two (2) year statute of limitations.  29 U.S.C. § 255(a); Edwards v. City of New York, 2011 WL 3837130, ** 4-5 (S.D.N.Y.).  Consequently, since this action was commenced April 5, 2010, this claim is time-barred.

### Tenth Claim – New York Labor Law

This claim is for wages pursuant to Article 6 of the New York State Labor Law. There are three (3) distinct grounds for dismissing this claim.  First, since the claim

sounds in tort, a Notice of Claim was required to be served upon the City within ninety (90) days after the claim arose, pursuant to § 50-e of the General Municipal Law of the State of New York.  Kalias v. City of Buffalo, 306 A.D.2d 932, 934 (4 Dept., 2003) lv. dn. 100 N.Y.2d 515 (2003).  Second, the action was commenced April 5, 2010 more than one year and ninety days after the claim accrued and, therefore, is barred by the applicable State statute of limitations.  (see 50-i of the General Municipal Law; Kalias v. City of Buffalo, supra.).  Finally, § 190(3) of the New York State Labor Law expressly provides that the term "employer" shall not include a governmental agency.

### Eleventh Claim – New York Labor Law § 215[17]

This claim is subject to the three defenses referred to above with respect to the Tenth Claim in the Amended Complaint.  In addition, § 215(2) provides a two (2) year statute of limitations and further requires that a Notice of Claim be served on the New York Attorney General at or before the commencement of any action under the section.

Consequently, even if a claim were stated and the three (3) defenses asserted with respect to the tenth claim did not apply, this claim would fail because of the two (2) year statute of limitations and the failure to provide a Notice of Claim on the New York Attorney General. Crosland v. City of New York, 140 F.Supp.2d 300, 312 (S.D.N.Y., 2001), aff'd 54 Fed. Appx. 504 (2 Cir., 2002).

---

[17] The Amended Complaint inadvertently refers to Labor Law § 216.

**Qualified Immunity**

It is respectfully submitted that Mayor Tutunjian was the final decision maker with respect to the actions taken on April 17, 2007.[18]  In this regard, under controlling law, Mayor Tutunjian is entitled to qualified immunity.    Although, of course, the constitutional right to be free from retaliation because of a public employee's speech or association activities was, under certain circumstances, recognized in April, 2007, it is submitted that under the facts of this case, on this record, a reasonably competent public official in Mayor Tutunjian's position would not have understood from existing law that the actions taken on April 17, 2007 with respect to the plaintiff Fitzgerald were unlawful. Saucier v. Katz, 533 U.S. 194, 201 (2001); Pierson v. Callahan, 555 U.S. 233 (2009). Further, were the right clearly established at the time, the record conclusively establishes that it was objectively reasonable for Mayor Tutunjian to have believed that the actions taken with respect to Officer Fitzgerald did not violate that right.  Luna v. Pico, 356 F.3d 481.  Finally, the record contains conclusive proof that Mayor Tutunjian did not possess any unconstitutional motive in the decision-making process on April 17, 2007, entitling him to qualified immunity.  Blue v. Koren, 72 F.3d 1075, 1084 (2 Cir., 1995).

**Conclusion**

Defendants respectfully request an Order pursuant to Rule 12(b)(6) and Rule 56(b) of the Federal Rules of Civil Procedure dismissing the Complaint and Amended Complaint in this action, on the merits and with prejudice on the joint and several grounds enumerated in a Notice of Motion based upon the arguments recited in this Memorandum of Law.  The defendants further request an award of attorney's fees as

---

[18] This argument is also advanced on behalf of defendants Tedesco and Mitchell should the Court conclude the participation of either or both in the decision-making process on March 17, 2007 was sufficient to make either or both responsible for those decisions.

prevailing parties pursuant to 42 U.S.C. § 1988 on the grounds that the action in each claim alleged in the Amended Complaint if frivolous, unreasonable and groundless and were continued by the plaintiffs after it clearly became so.   Defendants request such further, other and different relief as to the Court may seem just and proper.

DATED:          April 3, 2012                    Respectfully submitted,

NAPIERSKI, VANDENBURGH,
NAPIERSKI & O'CONNOR, LLP

By: _Thomas J. O'Connor_
       THOMAS J. O'CONNOR
       Bar Roll No.: 102285
Attorneys for Defendants
296 Washington Avenue Ext., Ste. 3
Albany, NY 12203
(518) 862-9292

2012/04169/MOL