**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ROBERT D. FITZGERALD and THE TROY**
**POLICE BENEVOLENT AND PROTECTIVE**
**ASSOCIATION, INC.,**

                              **Plaintiffs,**

        **vs.**                                          **1:10-cv-451**
                                                         **(MAD/RFT)**

**CITY OF TROY, NEW YORK; HARRY**
**J. TUTUNJIAN, in both his individual capacity**
**and his official capacity as Mayor of the City**
**of Troy; JOHN TEDESCO, individually and as**
**an Assistant Chief of Police for the City of Troy;**
**DAVID MITCHELL, individually; JANE ROE,**
**individually and in her official capacity as a**
**representative of the City of Troy; and JOHN**
**DOE, individually and in is official capacity as a**
**representative of the City of Troy,**

                              **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**GLEASON, DUNN, WALSH & O'SHEA**         **MARK T. WALSH, ESQ.**
40 Beaver Street
Albany, New York 12207
Attorneys for Plaintiffs

**NAPIERSKI, VANDENBURGH, NAPIERSKI**     **THOMAS J. O'CONNOR, ESQ.**
**& O'CONNOR, LLP**                       **ASA S. NEFF, ESQ**.
296 Washington Avenue Extension
Albany, New York 12203
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On April 15, 2010, Plaintiffs commenced this action alleging that Defendants, among other things, violated their rights under the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution.  *See* Dkt. No. 1.  Plaintiffs also alleged several state-law claims and a violation of the Fair Labor Standards Act ("FLSA").  *See id.*  On December 30, 2010, Plaintiffs amended their complaint.  *See* Dkt. No. 39.

Currently before the Court is Defendants' motion for summary judgment.  *See* Dkt. Nos. 89-94, 100-101.

## II. BACKGROUND[1]

Plaintiff Robert Fitzgerald has been a police officer employed by the City of Troy since 1990.  *See* Dkt. No. 39 at ¶ 8.  Plaintiff Fitzgerald has been a member of Plaintiff Troy Police Benevolent and Protective Association, Inc. ("PBA" or the "Union") since 1990 and has been its duly elected President since 2004.  *See id.*

Plaintiff Fitzgerald was a vocal critic of the City's administration on a number of issues, which on occasion caused Defendant Tutunjian to be "upset" with Plaintiff Fitzgerald.  Defendant Tutunjian believed that Plaintiff Fitzgerald should "not speak to the media as much as he did." *See* Dkt. No. 90 at 24.[2]  In fact, on June 3, 2007, Defendant Tutunjian wrote a letter to the "Pulse of the People" section of the Troy Record, in which he was publically critical of Plaintiff Fitzgerald's statement that the Troy Police Department was in a "state of crisis" and accused him of "shopping around his story to various media outlets."  *See* Dkt. No. 107 at 27.

---

[1] Unless otherwise noted, the facts contained in the "Background" section of this Memorandum-Decision and Order are undisputed.

[2] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

In the fall of 2006 and into early 2007, an issue arose concerning public disciplinary proceedings against three members of the Troy Police Department for allegedly ignoring a criminal defendant's request for a lawyer and thereby violating his *Miranda* rights. *See id.* at 29-30.  In response to the ongoing proceedings, Troy Police Chief Kaiser issued an order prohibiting "all sworn and non-sworn personnel . . . from speaking to the public, public officials, or media representatives regarding the recent internal investigation." *See id.* at 37.  In his deposition testimony, Defendant Mitchell testified that he informed Plaintiff Fitzgerald's counsel about this order so that when he spoke to the press about these issues, he would be sure to identify himself as the PBA President "so that he wasn't violating this order[.]" *See* Dkt. No. 93-2 at 128-130.  In an article in the Troy Record dated January 31, 2007, Plaintiff Fitzgerald, who was identified as the Troy PBA President, made comments critical of Defendants Tedesco and Mitchell, and the way in which the investigation and disciplinary proceeding was being handled. *See* Dkt. No. 107 at pg. 30.

In December of 1995, the Troy City Council adopted a resolution requiring police officers hired after December 22, 1995 to reside within the City of Troy. *See* Dkt. No. 101 at ¶ 1 (citation omitted); *see also Troy Police Benevolent & Protective Ass'n, Inc. v. City of Troy*, 299 A.D.2d 710, 711 (3d Dep't 2002).  In early 2007, enforcement of the residency ordinance was advocated by certain members of the Troy City Council to disqualify several police officers on a list making them eligible for promotion to Sergeant. *See* Dkt. No. 101 at ¶ 2.  It was rumored within the Police Department that Officer Steven Seney, who was on the Sergeants List, had written an anonymous letter to the Troy Civil Service Commission identifying several officers on the list who did not reside within the City of Troy. *See id.* at ¶ 3.  Through 2007, the residency ordinance had not typically been enforced and it became "a bone of contention that someone was

anonymously encouraging that it be enforced with respect to the Sergeant's List." *See id.* at ¶ 4.

The Civil Service Commission published a notice of three public meetings concerning the residency requirement. *See* Dkt. No. 107 at pg. 52-65. A proposed resolution by Councilwoman Carolin Collier that would have imposed termination from City employment for a continued violation of the residency requirement was debated at public meetings of the City Council and in the news media. *See id.* at pg. 50. The Civil Service Commission originally scheduled a public hearing on the issue for February 21, 2007, but the formal discussion of the issue was tabled until the next meeting on March 21, 2007. Plaintiff Fitzgerald was a vocal opponent of the enforcement of the law at these meetings, and his criticisms of City officials were quoted in various media outlets. *See id.* at pg. 39-51.

On March 21, 2007, the Civil Service Commission began the series of public meetings at which the question of whether the residency requirement would be applied was discussed. Plaintiff Fitzgerald attended these meetings, along with members of the public and other police personnel. A Civil Service eligible list for promotions to the position of police sergeant based on competitive examination results had been created, and it included the names of both resident and non-resident police officers. The Civil Service Commission had put forth a proposal to send out notices disqualifying eligible members on the list who were not residents of the City of Troy. *See id.* at pg. 60. Police Chief Nicholas Kaiser raised concern that the enforcement of the residency requirement would hurt his department because he may be forced to promote those who are less qualified if the most qualified candidates were disqualified because they resided outside of the City. *See id.* at pg. 59. Plaintiff Fitzgerald echoed Chief Kaiser's remarks and directed the Commission's attention to its own rule which provided that the residency requirement may be suspended by the Commission in cases where difficulty of recruitment makes such a requirement

against the public interest.  *See id.*

The Civil Service Commission eventually voted to send out notices of potential disqualification to the non-resident officers and set a hearing date for May 3, 2007.  *See id.* at pg. 60.  On April 2, 2007, the Troy Record published a story discussing the pros and cons of residency requirements and quoted both Plaintiff Fitzgerald and Police Chief Kaiser.  *See id.* at pg. 41.

During his deposition, Deputy Chief McAvoy testified that, during this time, Defendant Tutunjian would discuss Plaintiff Fitzgerald during their regular meetings and the comments he would make to the public.  *See* Dkt. No. 92-5 at 40-41. Deputy Chief McAvoy believed that Defendant Tutunjian was inquiring to see if Plaintiff Fitzgerald was violating any rules or regulations by providing statements to the media and, if so, what could be done about it.  *See id.*

In April of 2007, the residency ordinance and the decision whether to enforce it regarding the Sergeants List became a heated issue within the department and even made the front page of the local newspaper.  *See* Dkt. No. 101 at ¶ 5; Dkt. No. 109-2 at ¶ 5.  On April 9, 2007, at a regularly scheduled Troy PBA meeting, there was a discussion of the Sergeants List issue.  *See id.* at ¶ 6.  Several officers were upset about potentially losing their spot on the Sergeants List because of the residency requirement.  *See id.* at ¶ 7.  At some point, an officer mentioned that someone might go to Officer Seney's wife and inform her about an alleged extramarital affair because several officers believed that Officer Seney was to blame for creating the residency issue. *See id.* at ¶ 8; Dkt. No. 109-2 at ¶ 8.

On Wednesday, April 11, 2007, the Troy Civil Service Commission sent letters to certain individuals on the Sergeants List advising them that they would be disqualified from consideration because they were in violation of the residency requirement.  *See id.* at ¶ 9.  The

letter advised these officers that they could submit to the Commission, either in writing prior to the next Commission meeting or in person at the next meeting, any reasons they had in opposition to this proposed action.  *See* Dkt. No. 109-2 at ¶ 9; *see also* Dkt. No. 107-1 at 75 (citation omitted).

Thereafter, on April 13, 2007, the Police Department's Emergency Response Team ("ERT") conducted a training session at the Lansingburgh High School.  *See* Dkt. No. 101 at ¶ 10. Plaintiff Fitzgerald was a member of the ERT and was present at the training session.  *See id.* at ¶ 11.  The Sergeants List and residency ordinance were the subject of a boisterous discussion during the lunch break that day.  *See id.* at ¶ 12.  During the discussion, anger was expressed at Officer Seney, with one officer complaining that Officer Seney did not back up his people and that he was always the last one to respond to a call.  *See id.* at ¶ 13.  The threat to inform Officer Seney's wife about his alleged extramarital affairs was also discussed.  *See id.* at ¶ 14.

Due to the heated nature of the conversation, Plaintiff Fitzgerald was concerned about Officer Seney's physical safety.  *See id.* at ¶¶ 15-16; Dkt. No. 109-2 at ¶¶ 15-16.  Plaintiff Fitzgerald felt that there was a reasonable potential for some type of violence, which is why he went to Defendant Tedesco, Assistant Chief of Police for the City of Troy, to report the problem. *See* Dkt. No. 101 at ¶ 17.  After leaving the ERT training session, Plaintiff Fitzgerald advised Defendant Tedesco that officers were upset with Officer Seney and that it would not surprise him if someone "decided to invite Seney out in the garage for a fist fight."  *See id.* at ¶ 18.  Plaintiff Fitzgerald told Defendant Tedesco that officers were blaming Officer Seney for writing an anonymous letter to the Civil Service Commission regarding the Sergeants List.  *See id.* at ¶ 19. In response, Defendant Tedesco told Plaintiff Fitzgerald that he would discipline the responsible individuals if violence did occur.  *See id.* at ¶ 21; Dkt. No. 109-2 at ¶ 21.

After Plaintiff Fitzgerald left Defendant Tedesco's office, Defendant Tedesco called Captain Anthony Magnetto, the patrol captain of the afternoon shift.  *See* Dkt. No. 101 at ¶ 23; *but see* Dkt. No. 109-2 at ¶ 23 (admitting the allegation in part, but arguing that Defendant Tedesco's first call after Plaintiff Fitzgerald left the office was to Councilwoman Carolin Collier). During the conversation, Captain Magnetto informed Defendant Tedesco that he was aware of the controversy over the Sergeants List and that he had scheduled a meeting with Officers Kittle and Seney to discuss the matter "because it was getting increasingly hostile."  *See* Dkt. No. 101 at ¶ 24.

Later that day, Plaintiff Fitzgerald spoke with Officer Seney outside of one of the Public Safety buildings.  During the conversation, Officer Seney felt that Plaintiff Fitzgerald seemed "agitated and aggressive."  *See* Dkt. No. 89-11 at 47.  Plaintiff Fitzgerald informed Officer Seney that he was the "topic of discussion" during the ERT training session earlier that day and that "the entire team was extremely angry with [him], and that the members were 'spuing venom' and that [his] personal safety was in jeopardy."  *See id.*  During the conversation, Plaintiff Fitzgerald called Sergeant Joe Centanni, who was at the training session, and he confirmed to Officer Seney that "people are enraged with [him] and that he wouldn't be surprised if things did become physical."  *See id.*  Plaintiff Fitzgerald then informed Officer Seney about several specific threats that were made, including that his personal vehicle may be vandalized, that other officers may not back him up on the job, that he may be physically assaulted, that someone may inform his wife about an alleged affair, and that his home may be "'sprayed with an MP5.'"  *See id.*  Further, Plaintiff Fitzgerald told him that he is referred to as "'Tedesco's blow job'" and stated that Officer Seney tells Councilwoman Collier everything.  *See id.*

After the conversation with Plaintiff Fitzgerald ended, Officer Seney went home and

called Officer Chris McDonald.  *See id.* at 48.  Officer McDonald confirmed the "anger and rage"

felt toward him by some of the members of ERT.  *See id.*  Further, Officer McDonald agreed "that

it is not out of the question that someone may become physical with" Officer Seney.  *See id.*

Officer Seney then proceeded to speak with Captain Magnetto about the situation, who offered

any assistance that Officer Seney would need.  Finally, after speaking with Captain Magnetto,

another officer, Sean Kittle, called and expressed that he was extremely angry with Officer Seney,

but that he would never fail to back him up at work.  *See id.*

On Saturday morning, April 14, 2007, Defendant Tedesco and Officer Seney attended a

karate class.  *See* Dkt. No. 101 at ¶ 25.  During the karate class, Officer Seney and Defendant

Tedesco discussed the conversation Officer Seney had with Plaintiff Fitzgerald the day before

outside the police station.  *See id.* at ¶ 26.  Officer Seney again discussed the threats made by

members of the ERT that had been relayed by Plaintiff Fitzgerald.  *See id.* at ¶ 27.

At some point after the karate class, Defendant Tedesco called Chief of Police Kaiser to

discuss the conversation he had with Officer Seney.  *See id.* at ¶ 28.  Chief Kaiser advised

Defendant Tedesco to prepare a written report for submission to him on Monday, April 16, 2007.

*See id.* at ¶ 29.  During the afternoon of April 14, 2007, Defendant Tedesco received a telephone

call from Officer Seney who reported writing on a grease board in the substation stating that

Officer Seney was a "rat."  *See id.* at ¶ 30.[3]

Pursuant to Chief Kaiser's instructions, Officer Seney prepared a written report dated

April 16, 2007, which he delivered to Defendant Tedesco.  *See id.* at ¶¶ 31-32.  Later on April 16,

---

[3] Plaintiffs assert that the writing on the grease board was written by someone who
Defendants conceded was not Plaintiff Fitzgerald and that, in fact, the internal affairs
investigation results indicated that Officer Seney wrote the message himself.  *See* Dkt. No. 109-2
at ¶ 30.

Chief Kaiser convened a meeting with Defendant Tedesco, Assistant Chief McAvoy, Captain Sprague and Captain Paurowski, Head of the Internal Affairs Bureau. *See id.* at ¶ 33. At the meeting, Captain Sprague told the others present that he was "unaware of any physical threats made against Officer Seney." *See* Dkt. No. 109-2 at ¶ 34; Dkt. No. 101 at ¶ 34. During the meeting, Chief Kaiser directed Captain Paurowski to immediately begin an internal affairs investigation into the matter. *See* Dkt. No. 101 at ¶ 35.

In a subsequent meeting, Chief Kaiser, Defendant Tedesco, Assistant Chief McAvoy and Captain Magnetto again interviewed Officer Seney regarding the alleged threats made against him. *See id.* at ¶ 36; *see also* Dkt. No. 91-12 at pg. 23-25. During this meeting, Officer Seney was visibly upset and on the verge of tears when speaking with Chief Kaiser and Assistant Chief McAvoy. *See id.* at ¶ 37.

In the early evening of April 16, 2007, Defendant Tutunjian met with Officer Seney at Councilwoman Carolin Collier's house and was given a copy of Officer Seney's April 15, 2007 typewritten statement. *See id.* at ¶ 39.[4] After returning home, Defendant Tutunjian attempted to call Bryan Goldberger, the City's labor attorney, but was unable to reach him. *See id.* at ¶ 41. Mr. Goldberger returned Defendant Tutunjian's call early the next morning and they discussed the situation with Officer Seney. *See id.* at ¶ 42. During the conversation, Defendant Tutunjian "referred to the contents" of Officer Seney's report. *See id.* at ¶ 44; Dkt. No. 109-2 at ¶ 44. The two also discussed whether what Plaintiff Fitzgerald said was illegal. *See id.* at ¶ 45. Further,

---

[4] Plaintiffs further assert that "[D]efendant Mitchell testified that he did not think such meeting was appropriate . . . , that it was not disclosed by [D]efendant Tedesco or Seney during the Internal Affairs interviews . . . , and that if that meeting had been disclosed to him, he would not have agreed to joint representation with the [D]efendants Tutunjian and Tedesco because he did not want to be 'tarnished' and 'tainted' by being liked [sic] to it[.]" *See* Dkt. No. 109-2 at ¶ 39 (internal citations omitted).

based on their discussion, Mr. Goldberger informed Defendant Tutunjian that it was within his authority to place Plaintiff Fitzgerald on administrative leave, if he felt it appropriate. *See id.* at ¶ 46.[5]  Moreover, Mr. Goldberger told Defendant Tutunjian that, with respect to any alleged criminal conduct, the matter should be discussed with Chief Kaiser and his assistant chiefs. *See id.* at ¶ 47.

On April 17, 2007, Defendant Tutunjian met with Defendant Tedesco and Assistant Chief McAvoy at a regularly scheduled weekly meeting. *See id.* at ¶ 48.  At the meeting, Defendant Tutunjian informed those present that he had met with Officer Seney (omitting the fact that the meeting was at Carolin Collier's house the previous evening), and that he had a copy of Officer Seney's typewritten statement with him. *See id.* at ¶ 49; *see also* Dkt. No. 109-2 at ¶ 49 (citations omitted).  At the meeting, Defendant Tutunjian brought up the possible arrest of Plaintiff Fitzgerald based on the allegations in Officer Seney's typewritten statement. *See* Dkt. No. 101 at ¶ 50.  When Chief Kaiser and Assistant Chief McAvoy advised Defendant Tutunjian that there was not enough for an arrest or for departmental charges based on the evidence that they had, Defendant Tutunjian became "agitated" with them and raised his voice. *See id.* at ¶ 51; *see also* Dkt. No. 109-2 at ¶ 51; Dkt. No. 91-10 at 12.

Later during this meeting, the option of placing Plaintiff Fitzgerald on administrative leave was discussed. *See* Dkt. No. 101 at ¶ 54.  Chief Kaiser and Assistant Chief McAvoy were of the opinion that they did not yet have enough proof to justify placing Plaintiff Fitzgerald on administrative leave. *See* Dkt. No. 91-12 at 42-44.  Chief Kaiser, at this point, was of the opinion that Plaintiff Fitzgerald was simply "a witness and trying to report a problem within the

---

[5] Plaintiffs assert that Defendant Tutunjian did not disclose to Mr. Goldberger certain relevant information, including the "secret meeting at Carolin Collier's house[.]" *See* Dkt. No. 109-2 at ¶¶ 45-46.

department[.]" *See* Dkt. No. 91-9 at 46-47.  Although Chief Kaiser was not in favor of disciplinary action or administrative leave at this time, administrative leave with pay was a more palatable option because it is not considered a disciplinary action and Plaintiff Fitzgerald would not be impacted financially.  *See* Dkt. No. 101 at ¶ 57; *see also* Dkt. No. 109-2 at ¶ 57 (citations omitted).

According to Chief Kaiser and Assistant Chief McAvoy, Defendant Mitchell was invited to come into the meeting at some point and advised Defendant Tutunjian what steps he could take with respect to Plaintiff Fitzgerald.  *See* Dkt. No. 91-10 at 5-8; Dkt. No. 92-6 at 17-20.  When Assistant Chief McAvoy expressed his opinion that they did not have sufficient evidence to arrest Plaintiff Fitzgerald, Defendant Mitchell told him that he was wrong in light of the sworn deposition provided by Officer Seney.  *See* Dkt. No. 92-6 at 18-19.  Thereafter, they again discussed the possibility of administrative leave, which would entail relieving Plaintiff Fitzgerald of duty for a period of time, relinquishing his gun, and that they could require him to submit to a psychological exam if they felt it necessary.  *See id.* at 21-22.

On the morning of April 17, 2007, Plaintiff Fitzgerald was interviewed by Captain Paurowski as part of the internal affairs investigation.  *See* Dkt. No. 101 at ¶ 70.  Prior to the interview, Captain Paurowski advised Plaintiff Fitzgerald that he was conducting an investigation into an April 15, 2007 report filed by Officer Seney, in which he recounted the conversation in which Plaintiff Fitzgerald informed him that several members of the ERT made threats against him in response to the controversy over the residency requirement.  *See id.* at ¶ 71.  At the end of the interview, Captain Paurowski asked Plaintiff Fitzgerald if there was anything about the investigation that he felt had not been covered and informed him that he had an opportunity to make a statement at that time.  *See id.* at ¶ 72.  At no point prior to or during the meeting did

Plaintiff Fitzgerald see Officer Seney's April 15, 2007 statement regarding the encounter and alleged threats. *See* Dkt. No. 107 at ¶ 49.

After Plaintiff Fitzgerald's interview was completed, he proceeded to work as usual. *See id.* at ¶ 52. At approximately 2:10 p.m., Plaintiff Fitzgerald was told to appear at the Chief's office later that afternoon. *See id.* At approximately 2:45 p.m., Plaintiff Fitzgerald met with Chief Kaiser and Defendant Tedesco and was told that he was being placed on administrative leave and was required to turn in his police identification, weapons, and keys to the building. *See id.* at ¶ 53; *see also* Dkt. No. 107-1 at 53, 60-61.[6] Plaintiff Fitzgerald was not provided reasons for this decision, other than that it was "'the Mayor's'" decision. *See id.* at ¶ 55; Dkt. No. 107-1 at 61. Moreover, Plaintiff Fitzgerald was told that he was going to be required to see a psychiatrist at a time and date to be determined. *See id.* at ¶ 54; Dkt. No. 107-1 at 61. Defendants did not tell Plaintiff Fitzgerald how long the suspension would last. *See id.* at ¶ 57; *see also* Dkt. No. 107-1 at 60. Plaintiff Fitzgerald was given a "very public police escort home" and, once there, he was asked to turn in his non-duty weapons, which he did. *See id.* at ¶ 58.

After being informed of the administrative leave, Plaintiff Fitzgerald asked a PBA attorney to determine the reason for Defendants' actions and to obtain tapes of all internal affairs interviews to date. *See id.* at ¶ 60. Moreover, as a result of being placed on administrative leave, Plaintiff Fitzgerald was not permitted to enter the building where the PBA office is located; and, therefore, he was unable to conduct his usual PBA activities. *See id.* at ¶ 62. Plaintiff Fitzgerald claims that his inability to effectively work on behalf of the PBA and its members caused the PBA harm, including the fact that they had to cancel an arbitration scheduled for April 26, 2007,

---

[6] Although Plaintiff Fitzgerald claims that he was "suspended," all testimony and evidence indicates that he was placed on "administrative leave" with pay. *See* Dkt. No. 107-1 at 53, 60-61.

which cost the PBA more than $2,500.  *See id.* at ¶ 63.

Moreover, on April 20, 2007, Plaintiff PBA filed a labor contract grievance in order to allow Plaintiff Fitzgerald to function as the PBA president.  *See id.* at ¶ 65.  The grievance sought to provide Plaintiff Fitzgerald with "access to the PBA office and necessary facilities for his continued investigation and adjustment of grievances and disputes with the City."  *See* Dkt. No. 107-1 at 53-56.

Six days after Plaintiff Fitzgerald was placed on "administrative leave," a City police officer delivered to him a notice to appear before a psychologist on May 1, 2007.  *See* Dkt. No. 107 at ¶ 67.  Upon receiving the notice, Plaintiff PBA commenced an Article 78 proceeding in New York State Supreme Court seeking a temporary restraining order prohibiting the City from compelling Plaintiff Fitzgerald to submit to a medical examination until after written notice of the facts that form the basis for any claim that he is not fit for duty is served in accordance with section 72 of New York Civil Service Law and ordering that, pending a hearing and determination on the application for a preliminary injunction, Plaintiff Fitzgerald be permitted to access the City of Troy Police Station and Public Safety buildings as was permitted prior to his placement on administrative leave.  *See id.* at ¶ 69; *see also* Dkt. No. 107-1 at 58-59.  The state court granted the temporary restraining order on April 24, 2007 and scheduled a hearing for April 27, 2007.  *See* Dkt. No. 107 at ¶ 71.  On April 25, 2007, the City withdrew its demand that Plaintiff Fitzgerald see a psychologist and the order banning him from the Public Safety buildings.  *See id.* at ¶ 72.

According to Plaintiffs, after Plaintiff Fitzgerald was permitted to reenter the Public Safety buildings, he was advised that when he wished to enter, he would have to use the public access door and wait for a management-designated police officer to escort him at all times while

13

in the building. *See id.* at ¶ 73. While he was in the PBA office, the police escort was stationed

in a chair placed immediately outside the door to the office. *See id.* at ¶ 74.

On April 27, 2007, as part of the internal affairs investigation, an unnamed officer was

ordered to report for an interview as a witness in the investigation. *See* Dkt. No. 107-1 at 89. The

order stated that the investigation was being made "into a report filed by Officer [Seney] where he

states that Officer Robert Fitzgerald informed him that several members of the Emergency

Response Team made threats against Officer [Seney's] safety and that these threats stemmed from

an ongoing dispute over an alleged letter sent to the Troy City Counsel involving members

currently on the promotional list for sergeant." *See id.*

On May 1, 2007, Mr. Goldberger, the City's labor attorney, met with Captain Paurowski

who advised him that the internal affairs investigation was wrapping up and that the case was

"unfounded." *See* Dkt. No. 109-2 at ¶ 75; Dkt. No. 91-4 at 3-4.

On May 4, 2007, Defendant Tutunjian released the following official statement reinstating

Plaintiff Fitzgerald and explaining the reasons he was placed on administrative leave:

> On Monday, April 16th I was approached by a Troy Police Officer
> who was concerned for his safety and the safety of his family. This
> officer indicated he had a discussion with Officer Robert Fitzgerald,
> at which time the officer believed that the PBA President was
> threatening him. The officer signed an official complaint against
> Officer Fitzgerald. Included in the allegations, the Officer said he
> was told that he could be assaulted at work, that his home could be
> shot at, personal property destroyed, and phone calls made to his
> wife about alleged extra-marital affairs.
>
> * * * * *
>
> Based on the preliminary findings of the IA investigation, and upon
> the advice of the Corporation Counsel's Office, there is insufficient
> evidence to sustain the allegations in the complaint. Therefore,
> Officer Fitzgerald has been placed back on duty, and the Chief of
> Police has been ordered to closely monitor the situation to ensure
> the safety of each person involved and the community at large.

14

*See* Dkt. No. 107-1 at 95.[7]

On May 1, 2007, Mr. Goldberger advised Defendant Tutunjian of his conversation with Captain Paurowski.  *See* Dkt. No. 101 at ¶ 76.  On May 4, 2007, Defendant Tutunjian instructed Chief Kaiser to return Plaintiff Fitzgerald to active duty effective Monday, May 7, 2007.  *See id.* at ¶ 77.  According to Plaintiffs, Defendant Tutunjian waited until the day after the Civil Service Commission held its May 3, 2007 public meeting and made its final ruling regarding the residency requirement's application to the Sergeants List before he released the press release concerning the results of the internal affairs investigation or notified Chief Kaiser to return Plaintiff Fitzgerald to active duty.  *See* Dkt. No. 109-2 at ¶ 76.

Further, Plaintiff Fitzgerald claims that the City did not deliver to him his paychecks during the period of his "administrative leave" and, since he was ordered to stay out of the building where he usually retrieved his paychecks, he was not paid for the work he performed earlier in the week of April 16 or while he was on leave with pay.  *See* Dkt. No. 107 at ¶ 68.  As such, Plaintiff Fitzgerald claims that he was, "in effect, suspended without pay."  *See id.*[8]

On April 15, 2010, Plaintiffs commenced the present action.  *See generally* Dkt. No. 1.  In their amended complaint, Plaintiffs set forth eleven causes of action alleging First Amendment

---

[7] In his deposition, Captain Paurowski explained that in his conversation with Mr. Goldberger regarding his investigation, he never used the words "insufficient evidence" in describing his conclusion.  *See* Dkt. No. 91-4 at 3-4.  Captain Paurowski explained that he believes there is a big difference between "unfounded" and "insufficient evidence," in that "insufficient evidence" makes it sound "as though it happened but there just isn't enough to sustain the allegation[.]"  *See id.* at 4.  As such, Captain Paurowski testified that the May 4, 2007 news release issued by Defendant Tutunjian stating that there was "insufficient evidence to sustain the allegations in the complaint" was not consistent with his findings in the investigation.  *See id.* at 2-4.

[8] It is undisputed that Plaintiff Fitzgerald did eventually receive the compensation that he was due for both the work performed on the week of April 16, 2007 and for the entire period he was placed on administrative leave.

15

retaliation, deprivation of a constitutionally protected property interest without due process of law, deprivation of a constitutionally protected liberty interest without due process of law, conspiracy, violation of privacy rights, violations of the Fair Labor Standards Act, and violations of New York Labor Law. *See generally* Dkt. No. 100.

## III. DISCUSSION

**A.     Summary judgment standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in

16

the record the assertions in the motion for summary judgment "would derogate the truth-finding

functions of the judicial process by substituting convenience for facts").


**B.      42 U.S.C. § 1983**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the

complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*,

423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the

plaintiff of rights and privileges secured by the Constitution, but the actions or omissions

attributable to each defendant must be the proximate cause of the injuries and consequent

damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y.

1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*,

445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a

section 1983 action, he must establish a causal connection between the acts or omissions of each

defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.*

(citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L.

Ed. 2d 619 (1979)) (other citation omitted).


**C.      First amendment retaliation**

"To survive a motion for summary judgment on a First Amendment retaliation claim, the

plaintiff must present evidence which shows '"[(1)] that the speech at issue was protected, [(2)]

that he suffered an adverse employment action, and [(3)] that there was a causal connection

between the protected speech and the adverse employment action.'"" *Cotarelo v. Vill. of Sleepy

Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quotation omitted).  "If a plaintiff makes

a sufficient showing of each of these elements, summary judgment is not appropriate unless the defendant establishes as a matter of law that he would have taken the same adverse employment action even absent the protected conduct." *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007) (citation omitted).

### 1. Plaintiffs' first claim

#### a. Was Plaintiff's speech constitutionally protected?

In determining whether a plaintiff's speech was constitutionally protected, the court must determine "whether [he] spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citation omitted). This determination requires two separate determinations: "(1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern." *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 291 (E.D.N.Y. 2009) (citing *Sousa*, 578 F.3d at 170). "If either of these requirements is not met, then plaintiff's First Amendment retaliation claim must fail as a matter of law." *Id.*

As the Supreme Court has explained, conducting the inquiry into whether speech is made "as a citizen" has sometimes proved difficult because of the enormous variety of factual situations that may arise in such cases. *See Garcetti*, 547 U.S. at 418 (quotation omitted). The inquiry is a "practical one," for which the Supreme Court has not articulated a comprehensive framework to define whether speech is in the course of an employee's duties. *See id.* at 424. Indeed, because the inquiry is fact-bound, courts sometimes defer resolution of this question because the record is not sufficiently developed or disputes of fact exist precluding resolution of this question as a matter of law. *See, e.g., Smith v. New York City Dep't of Educ.*, No. 09-cv-9256, 2011 WL 5118797, *7 (S.D.N.Y. Oct. 28, 2011) (explaining that "[a]ny reliable conclusion would require

evidence of precisely what was said and to whom it was communicated"); *Caraccilo v. Vill. of Seneca Falls*, 582 F. Supp. 2d 390, 407 (W.D.N.Y. 2008).  Nevertheless, the Second Circuit has recognized that the question of "[w]hether the employee spoke solely as an employee and not as a citizen is . . . largely a question of law for the court."  *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011).

A number of principles have emerged that guide this Court's inquiry.  The Supreme Court has noted that the test it has announced is guided by the overarching objectives at issue in its jurisprudence in this area.  *See Garcetti*, 547 U.S. at 418-19.  Weighing on the side of more limited First Amendment protection, the Court has noted that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services," and that the First Amendment does not entitle public employees to "constitutionalize the employee grievance." *Id.* at 418, 420 (citation omitted).  At the same time, however, "a citizen who works for the government is nonetheless a citizen," and the government's authority to limit citizen speech is necessarily limited by the First Amendment.  *See id.* at 419 (citation omitted).  Moreover, the public has an interest "in receiving the well-informed views of government employees engaging in civic discussion," further counseling against overly restrictive limitations on public employees' First Amendment rights.  *See id.*

With these principles in mind, *Garcetti* articulated a number of factors for courts to consider in resolving this question.  For instance, *Garcetti* explained that it is not dispositive that the speech at issue concerned the subject matter of the plaintiffs' employment because the First Amendment protects some expressions related to the speaker's job.  *See id.* at 421 (citations omitted).  Speech that "owes its existence" to the employee's responsibilities, however, is not

speech as a citizen for First Amendment purposes.  *Id.* at 421-22.  The *Garcetti* decision distinguished, for example, such speech from public statements outside the course of the employee's duties, including writing a letter to a local newspaper or discussing politics with a co-worker, noting that these activities are "the kind of activity engaged in by citizens who do not work for the government."  *Id.* at 423-24 (citations omitted).  In assessing this key consideration, the Supreme Court emphasized that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."  *Id.* at 424-25; *see also Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203 (2d Cir. 2010) (holding that, "under the First Amendment, speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer").

Courts considering this question in the wake *Garcetti* have also suggested considerations that help define whether an instance of speech is made pursuant to an employee's duties or as a citizen.  In *Weintraub*, the Second Circuit affirmed a district court's determination that a teacher who filed a union grievance and complained to an assistant principal about the assistant principal's failure to discipline a student who was throwing books at him was not engaged in speech as a citizen.  *See Weintraub*, 593 F.3d at 205.  In particular, the Court of Appeals concluded that the plaintiff's grievance was pursuant to his official duties under *Garcetti* "because it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' . . . as a public school teacher – namely to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning."  *Id.* at 203 (quotation and internal

citation omitted).   This conclusion was reinforced by the Court of Appeal's determination that the plaintiff's speech took the form of an employee grievance, for which there is no relevant civilian analogue, unlike submitting a letter to a newspaper or discussions of politics with a coworker. *See id.* at 203-04 (citations omitted).

In the present matter, Defendants contend that "the only speech or activity proximal to Fitzgerald being placed on administrative leave occurred on April 13, 2007." *See* Dkt. No. 100 at 17.  Defendants claim that the alleged protected speech includes Plaintiff Fitzgerald's brief conversation with Defendant Tedesco in the afternoon and his extended conversation with Officer Seney later that day. *See id.* at 17-18.  Defendants assert that both conversations "were part-and-parcel of plaintiff's core job responsibilities as a police officer and/or a PBA officer." *See id.* at 18.  Plaintiffs, however, contend that Defendants' motion is not addressed to the speech at issue in the first, second and third claims for relief. *See* Dkt. No. 109 at 24.  Plaintiffs argue that the amended complaint "makes clear that the speech at issue is focused on Officer Fitzgerald's statements in connection with the public debate regarding the residency requirement and whether its enforcement is good public policy." *See id.* (citations omitted).

Plaintiffs are correct that the relevant speech at issue concerns Plaintiff Fitzgerald's advocacy on matters of public concern, which were often in opposition to Defendants.  As discussed above, on April 2, 2007, the Troy Record published an article discussing the residency requirement and Plaintiff Fitzgerald was quoted and expressed his views as to why the requirement should not be enforced. *See* Dkt. No. 39 at ¶ 36 and Exhibit "C."  Three days after the article was published, Councilwoman Collier published a letter in the Troy Record in which she claimed that Plaintiff Fitzgerald "is once again not telling the truth" and criticized him for being unwilling to make any concessions during negotiations. *See id.* at Exhibit "D."  Moreover,

on March 21, 2007, Plaintiffs Fitzgerald and PBA, at a public meeting of the Civil Service Commission, raised concerns over the difficulties posed by the residency requirement, including that such a requirement would make it difficult to recruit and promote the most qualified for the position.  *See id.* at ¶¶ 33-34.

Moreover, Plaintiff Fitzgerald has claimed that he was retaliated against for his activities connected with the PBA, including his advocacy for policies that Defendants did not support. Although the Second Circuit has not decided whether "pure union membership" without union activity satisfies the "public concern" requirement, *see Donovan v. Village of Malverne*, 547 F. Supp. 2d 210, 218 (E.D.N.Y. 2008), the Circuit has held that "[t]here is no doubt that retaliation against public employees solely for their union activities violates the First Amendment."  *Clue v. Johnson*, 179 F.3d 57, 60 (2d Cir. 1999).  Most of the speech at issue here occurred while Plaintiff Fitzgerald was acting in his capacity as the union president, while he was off duty, at public meetings and to the media.

As such, the Court finds that Plaintiffs have clearly satisfied the "public concern" requirement; and, therefore, denies Defendants motion for summary judgment on this ground.

### b. Adverse employment action

"In the context of a First Amendment retaliation claim . . . retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action."  *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (quotation marks omitted); *see also Nixon v. Blumenthal*, 409 Fed. Appx. 391, 392 (2d Cir. 2010) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)).  "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in

pay, and reprimand." *Frisenda v. Inc. Village of Malverne*, 775 F. Supp. 2d 486, 510 (E.D.N.Y. 2011) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).  "However, 'lesser actions may also be considered adverse employment actions.'"  *Id.*; *see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass" (citing *Bernheim v. Litt*, 79 F.3d 318, 324-25 (2d Cir. 1996)).

In the present matter, Plaintiff Fitzgerald has put forth sufficient evidence to suggest that he suffered an adverse employment action.  As discussed, Defendants placed Plaintiff Fitzgerald on administrative leave, prohibited him from entering the Public Safety buildings and police station, and made him turn in his service weapons, personal weapons, and department identification.  Moreover, Defendants instituted an internal affairs investigation against Plaintiff Fitzgerald which the investigator, Captain Paurowski, eventually deemed to be "unfounded."  *See Everitt v. DeMarco*, 704 F. Supp. 2d 122, 134 (D. Conn. 2010) (finding that initiating an investigation against the plaintiff in retaliation for protected speech, by itself, could be an adverse employment action, thereby preventing the court from granting the defendant's motion for summary judgment).  Further, although the order was eventually withdrawn, Plaintiff Fitzgerald was ordered to appear for a psychological evaluation as part of the conditions of his administrative leave.  *See Hasper v. County of Suffolk*, No. 11-CV-3227, 2012 WL 2921218, *4 (E.D.N.Y. July 12, 2012) (citation omitted).  Finally, Plaintiffs have also presented evidence that Defendants' actions may have prevented Plaintiff Fitzgerald from effectively performing his obligations as President of the PBA.

As such, the Court finds that questions of fact exist which prevent the Court from granting Defendants' motion on this ground.

### c. Causation

It is well settled that proof of causation may be shown indirectly by, among other things, demonstrating that the protected activity was followed closely by a retaliatory action.  *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)) (other citation omitted); *see also Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  Further, the cases demonstrate that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001).  The relevance of temporal proximity in a particular First Amendment retaliation case turns on its unique facts and circumstances.  *See Smith v. Da Ros*, No. 09 Civ. 458(MRK), 2011 WL 839374, *13 (D. Conn. Feb. 25, 2011) (citing *Burkybile v. Bd. of Educ. of Hastings–On–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005)).

In the present matter, there is evidence of temporal proximity between Plaintiff Fitzgerald's protected activity – his public objections to the enforcement of the residency requirement – and the adverse employment actions.  As discussed above, on April 2, 2007, the Troy Record published an article discussing the residency requirement and Plaintiff Fitzgerald was quoted and expressed his views as to why the requirement should not be enforced.  *See* Dkt. No. 39 at ¶ 36 and Exhibit "C."  Three days after the article was published, Councilwoman Collier published a letter in the Troy Record in which she claimed that Plaintiff Fitzgerald "is once again not telling the truth" and criticized him for being unwilling to make any concessions during negotiations.  *See id.* at Exhibit "D."  Moreover, on March 21, 2007, Plaintiffs Fitzgerald and PBA, at a public meeting of the Civil Service Commission, raised concerns over the difficulties

posed by the residency requirement, including that such a requirement would make it difficult to recruit and promote the most qualified for the position. *See id.* at ¶¶ 33-34. Plaintiff Fitzgerald was placed on administrative leave and the internal affairs investigation commenced on April 17, 2007.

Although the Second Circuit has not "drawn a bright line" setting the outer limits beyond which a temporal proximity is too attenuated to find the causal relationship, it has held that periods of time considerably longer than the two weeks at issue here are sufficient to establish the plaintiff's *prima facie* case. *See Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) ("While we have not 'drawn a bright line' defining the maximum time period that can give rise to an inference of causation, six weeks fits comfortably within any line we might draw"); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006) ("Only a short time passed from [plaintiff's protected] speech to the abolition of his job. The Board abolished [plaintiff's] position on February 26, 2002, a little over three months after his November 7, 2001 letter and only three weeks after his January 31, 2002 press conference. We cannot agree that these time periods are too long for any inference of retaliatory motive and causation to be drawn"); *Forde v. Donahoe*, No. 10-CV-2445, 2012 WL 1020038, *11 (E.D.N.Y. Mar. 26, 2012) ("Indeed, in order for temporal proximity to establish a causal connection, the retaliatory acts must occur in 'as few as three months'").

Plaintiffs' claims are further supported by the deposition testimony of Assistant Chief McAvoy, in which he stated that, during this time, Defendant Tutunjian would often discuss Plaintiff Fitzgerald during their meetings and inquire about whether his contact with the media was violating any rules or regulations. *See* Dkt. No. 92-6 at 18-19. Further, the fact that Defendant Tutunjian declined to follow the advice of Defendant Mitchell, an attorney, to refrain

from taking any action until after the Internal Affairs investigation concluded is additional evidence of an improper retaliatory motive. *See Mata v. Anderson*, 685 F. Supp. 2d 1223, 1280 (D.N.M. 2010).

Based on the foregoing, the Court finds that Defendants have failed to establish that they are entitled to judgment as a matter of law on this ground.

### d. Rebuttal of Plaintiffs' prima facie case

It is well settled that "even if there is evidence that the adverse employment action was motivated by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998) (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S. Ct. 568) (other citations omitted). As the Second Circuit has explained, "[t]his principle prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct." *Id.* (citations omitted). Thus, the Second Circuit has held that "[c]onduct that is properly initiated, reasonably executed, independently justified and equally administered – regardless of any animosity towards the plaintiff – does not give rise to a constitutional claim for retaliatory harassment." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 109 (2d Cir. 2000) (citing *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977)) (other citations and footnote omitted).

In its motion for summary judgment, Defendants' only argument as to this point reads as follows: "Even assuming Mayor Tutunjian acted partly based upon an improper retaliatory motive based upon plaintiff Fitzgerald's protected speech – a generous assumption – any reasonable jury

26

would determine on this record that Officer Fitzgerald would have been placed on administrative leave by Mayor Tutunjian with its accompanying strictures, absent any such motive." *See* Dkt. No. 100 at 22 (citations omitted).  The Court disagrees and finds that this conclusory statement falls far short of meeting Defendants' burden in rebutting Plaintiffs' *prima facie* case.  As discussed above, the evidence and deposition testimony presents numerous contradictory accounts of the events leading up to the adverse employment action taken.  Defendants have failed to establish that, but for Plaintiff Fitzgerald's protected activity, they would have still placed him on administrative leave.  Moreover, Plaintiff Fitzgerald's allegations are further supported by the fact that he was not returned to active duty until the day after the Civil Service Commission held its May 3, 2007 public meeting and made its final ruling regarding the residency requirement's application to the Sergeants List.

Additionally, in his report, Officer Seney discussed another officer who told him about the threats and the possibility of violence, but no disciplinary action was taken against this other officer.  Clearly, questions of fact exist which preclude the Court from granting Defendants' motion for summary judgment.

Moreover, the Court finds that Defendants have failed to establish that the potential disruptiveness was enough to outweigh the value of the speech or that Plaintiff Fitzgerald was placed on administrative leave based on this potential for disruption and not in retaliation for his speech. *See Anemone v. Metropolitan Transp. Auth.*, 629 F.3d 97, 119 (2d Cir. 2011) (quotation omitted).  Viewing the evidence in the light move favorable to Plaintiffs, a reasonable jury could determine that Defendants contributed to any potential disruption and that without the improper motive, Defendants would not have taken any retaliatory action against Plaintiff Fitzgerald.  *See id.* (citation omitted).

27

In sum, accepting Plaintiffs' evidence as true and drawing all reasonable inferences in their favor, the Court concludes that the record contains genuine issues of material fact that defeat Defendants' motion for summary judgment on the issue of whether Defendants would have disciplined Plaintiff Fitzgerald absent the protected activity in which he engaged.  The Court notes that it does not hold that, but for Plaintiffs' protected activity, Defendants would not have taken adverse employment action against him; indeed they may well have.  Rather, the Court only holds that Defendants have not met their burden to allow the Court to grant summary judgment on this

basis.


### 2. Plaintiffs' second claim

In the second claim for relief, Plaintiffs assert that Defendants deprived Plaintiff Fitzgerald of his ability to function as PBA President "and have attempted to interfere with and retaliate against [him] because [he], in his capacity as Union President, advocated on behalf of his members and spoke with his members."  *See* Dkt. No. 39 at ¶ 109.  Specifically, Plaintiffs argue that

> Defendants' retaliation against plaintiff includes the actions such as monitoring, shadowing and surveilling plaintiff and thereby preventing and making it more difficult for him to associate and communicate with the members of the PBA who elected him their President, as well as others, such as PBA counsel, who attempted to engage in confidential communications with the plaintiff in plaintiff's office with the monitor outside the door and refusing to participate in the grievance process set forth in the Collective Bargaining Agreement between the PBA and the City with respect to grievances filed by plaintiff PBA President Fitzgerald for other members or the PBA itself or on behalf of plaintiff Fitzgerald himself, thereby increasing the cost of the process of labor dispute dissolution and attempting to make plaintiff Fitzgerald appear less effective as a PBA leader so as to attempt to foment dissatisfaction

among the ranks of the PBA membership with plaintiff Fitzgerald.

*See id.* at ¶ 111.  Plaintiffs claim that these actions have chilled members of the PBA from

communicating with Plaintiff Fitzgerald and that these actions have violated Plaintiff Fitzgerald's

"right of freedom of speech, freedom of association and freedom of assembly[.]"  *See id.* at ¶¶

112-113.

Defendants argue that the Court should dismiss this claim because a public employee

bringing this form of claim must establish the same elements as a First Amendment retaliation

claim based upon speech, including that the associational conduct at issue touches upon a matter

of public concern.  *See* Dkt. No. 100 at 23.  Further, Defendants assert Plaintiff Fitzgerald's union

related speech was not constitutionally protected and that the evidence demonstrates that his

administrative leave in no way inhibited his work on behalf of the PBA.  *See id.* at 23-24

(citations omitted).

Contrary to Defendants' assertions, Plaintiffs have met their burden as to this claim.  As

discussed, Plaintiff Fitzgerald's "associational conduct" related to matters of public concern.  *See*

*Cobb v. Pozzi*, 363 F.3d 89, 102-03 (2d Cir. 2004) (citations omitted).  Specifically, acting as the

PBA President, Plaintiff Fitzgerald spoke to government officials and the media on numerous

occasions, often taking positions on issues contrary to those of the Defendants.  He openly

opposed the residency requirement because he felt it was not in the public's best interest.

Moreover, the evidence and testimony of Plaintiff Fitzgerald creates issues of fact as to

whether Defendants' conduct inhibited his work on behalf of the PBA.  Specifically, the evidence

suggests that, during the time Plaintiff Fitzgerald was placed on administrative leave until the

state court issued the temporary restraining order, he was not permitted to enter the building

containing the PBA office.  Moreover, even after he was permitted to enter the office, he was

monitored by a police officer, who was present whenever Plaintiff Fitzgerald was conducting

business on behalf of the PBA and its members.  Further, Plaintiffs were forced to postpone an

arbitration because of these events.

Also, as discussed, Plaintiff Fitzgerald's protected speech occurred in close temporal

proximity and under circumstances suggesting that Defendants' actions may have been retaliatory

in nature.  Finally, the Court finds that Defendants have failed to put forth sufficient evidence to

rebut Plaintiffs' *prima facie* case.

However, as to any allegations in the second claim regarding conduct that occurred prior

to April 15, 2007, Defendants are correct that any such claim is barred by the applicable three-

year statute of limitations.  *See Owens v. Okure*, 488 U.S. 235, 249-51 (1989).

Based on the foregoing, the Court grants in part and denies in part Defendants' motion for

summary judgment as to Plaintiffs' second claim.[9]

### 3. Plaintiffs' third claim

Without providing support for their argument, Defendants contend that Plaintiffs' third

claim on behalf of Plaintiff PBA was first asserted in their amended complaint and, therefore,

barred by the three-year statute of limitations.  *See* Dkt. No. 100 at 24.

"So long as the original and amended petitions state claims that are tied to a common core

of operative facts, relation back will be in order."  *Mayle v. Felix*, 545 U.S. 644, 664 (2005)

(footnote omitted).  Pursuant to Rule 15 of the Federal Rules of Civil Procedure, "the central

inquiry is whether adequate notice of the matters raised in the amended pleading has been given

---

[9] The Court notes that Defendants' motion for summary judgment as to this claim is only granted as to any claims accruing prior to April 15, 2007.

to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (internal quotation marks and citation omitted).  "Where the amended complaint does not allege a new claim but renders prior allegations more definite and precise, relation back occurs." *Id.*

In the third claim in the amended complaint, Plaintiffs allege that Defendants are liable to Plaintiff PBA "for the PBA's expenditures in seeking to compel the City to allow [P]laintiff Fitzgerald to function as the president it duly elected and to service his PBA member constituents, including the costs of seeking restoration of [P]laintiff Fitzgerald to his full PBA president status without interference and monitoring and related expenses and for the increased expenditures to the PBA by reason of the refusal of the City to participate in the grievance process with respect to any grievance filed by or on behalf of [P]laintiff Fitzgerald since late 2006-early 2007 as aforesaid." *See* Dkt. No. 39 at ¶ 118.  In Plaintiffs' second claim in the original complaint, Plaintiffs allege that Defendants retaliated against them by "monitoring, shadowing and surveilling" Plaintiff Fitzgerald and thereby prevented and made it "more difficult for him to associate and communicate with members of the PBA who elected him their President[.]" *See* Dkt. No. 1 at ¶ 111.  Moreover, in the original complaint, Plaintiffs discuss the Article 78 proceeding they were forced to bring in state court to enforce Plaintiff Fitzgerald's rights and to allow him to function as PBA President.  *See id.* at ¶ 71.  Clearly, Plaintiffs' third claim is tied to the common core of operative facts pled in the original complaint and Defendants were provided sufficient notice of the matters raised.  As such, the Court finds that this portion of Plaintiffs' third claim is timely, since it relates back to when the original complaint was filed.

However, to the extent that Plaintiffs are now attempting to assert a claim for damages related to "the increased expenditures to the PBA by reason of the refusal of the City to

participate in the grievance process with respect to any grievance filed by or on behalf of [P]laintiff Fitzgerald since late 2006-early 2007[,]" the Court finds that such a claim does not share a common core of operative facts with the original pleading and, therefore, does not relate back to the filing of the original complaint.  This allegation is not sufficiently related to the claims set forth in the original complaint.  Moreover, even if the Court were to find that this claim did relate back to the original complaint, the claim would still be untimely.  Plaintiffs' complaint was filed on April 15, 2010.  Therefore, all claims that accrued prior to April 15, 2007 are barred by the applicable three-year statute of limitations governing section 1983 actions in New York.  *See Owens*, 488 U.S. at 249-51.

Moreover, Defendants' conclusory statement that this claim is facially implausible, providing citations to only *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), is insufficient to carry its burden.  Plaintiffs plausibly allege that, as a result of Defendants' retaliatory conduct, Plaintiff Fitzgerald was prevented from effectively serving as President of the PBA, which required Plaintiff PBA to commence an action in state court.  *See* Dkt. No. 39 at ¶¶ 118-19.  For the reasons discussed in relation to Plaintiffs' first two claims, the Court finds that this claim is not facially implausible and that Plaintiff PBA is a proper party to this suit.  *See Allee v. Medrano*, 416 U.S. 802, 819 n.13 (1974) (holding that "[u]nions may sue under 42 U.S.C. § 1983 as persons deprived of their rights secured by the Constitution and laws, . . . and it has been implicitly recognized that protected First Amendment rights flow to unions as well as to their members and organizers" (citations omitted)).

Based on the foregoing, the Court holds that Defendants' motion for summary judgment as to Plaintiffs' third claim is granted in part and denied in part.

### 4. Personal involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quotation and other citations omitted). "'[W]hen monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.'" *Id*. (quoting *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.)). There is a sufficient showing of personal involvement of a defendant if (1) the defendant directly participated in the alleged constitutional deprivation; (2) the defendant is a supervisory official who failed to correct the wrong after learning about it through a report or appeal; (3) the defendant is a supervisory official who created a policy or custom under which the constitutional deprivation occurred, or allowed such a policy or custom to continue; or (4) the defendant is a supervisory official that was grossly negligent in managing subordinates who caused the constitutional deprivation. *See id.* (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

In the present matter, Plaintiffs have presented sufficient evidence to create issues of fact regarding whether Defendants Tutunjian and Tedesco retaliated against them in violation of their First Amendment rights. Plaintiffs have failed, however, to establish the personal involvement of Defendant Mitchell. First, Defendant Mitchell did not make the decision to place Plaintiff Fitzgerald on paid administrative leave; he simply drafted the order that was sent to the department chiefs pursuant to Defendant Tutunjian's request. *See* Dkt. No. 89-11 at 44. Second, in a confidential letter sent to Defendant Tutunjian on April 17, 2007, Defendant Mitchell again advised Defendant Tutunjian that the internal affairs investigation and any criminal investigation that he may wish to pursue should be referred to outside the police department. *See id.* at 64.

33

Defendant Mitchell concluded the letter with the following recommendation: "Finally, regardless of whether you outsource this matter or proceed with the internal affairs investigation and criminal investigation within the Troy Police department, you should consider holding off on placing Officer Fitzgerald on paid administrative leave until the completion of the Internal Affairs Bureau investigation and results of same." *See id.* This letter establishes that Defendant Mitchell was actually opposed to taking any adverse action against Plaintiff Fitzgerald prior to the completion of the investigation.

Moreover, Plaintiffs fail to provide the Court with any possible motivation as to why Defendant Mitchell would take retaliatory action against him. Although it is clear that Defendants Tutunjian and Tedesco were proponents of the residency requirement and that they were often in disagreement with Plaintiff Fitzgerald's stance regarding policy issues, Plaintiffs point to no such evidence with respect to Defendant Mitchell. In fact, as the letter discussed above makes clear, Defendant Mitchell was actually opposed to taking any adverse action against Plaintiff Fitzgerald until the Internal Affairs investigation was complete.

Based on the foregoing, the Court finds that Plaintiffs have failed to meet their burden of establishing that Defendant Mitchell was personally involved in the alleged unconstitutional conduct; and, therefore, the Court grants Defendants' motion for summary judgment insofar as it seeks the dismissal of Defendant Mitchell for his lack of personal involvement.

**D.      Deprivation of property interest without due process**

In their fourth claim, Plaintiffs assert that Plaintiff Fitzgerald was deprived of a property interest without due process of law. *See* Dkt. No. 39 at ¶¶ 121-127. Defendants contend that this claim should be dismissed because, pursuant to controlling case law, an employee who continues

to be paid by his employer cannot sustain a section 1983 claim for deprivation of property without due process. *See* Dkt. No. 100 at 25 (citations omitted). Plaintiffs, however, contend that Plaintiff Fitzgerald was not paid during the time for which he was placed on administrative leave and, therefore, this part of Defendants' motion should be denied. *See* Dkt. No. 109 at 37 (citation omitted).

In order to prevail on a Fourteenth Amendment procedural due process claim pursuant to 42 U.S.C. § 1983, "the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 656 (E.D.N.Y. 2009) (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001)). "Property rights arise from '"an independent source such as state law," [with] federal constitutional law determin[ing] whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.'" *Pichen v. City of Auburn, N.Y.*, 728 F. Supp. 2d 192, 198 (N.D.N.Y. 2010) (quotation and other citation omitted). The essential principle of procedural due process is that a deprivation of life, liberty or property should be preceded by notice and an opportunity for a hearing appropriate to the nature of the case. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted). However, "[w]here there is a meaningful postdeprivation remedy, there is no due process violation." *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998).

In the present matter, Plaintiff Fitzgerald claims that he was not paid while he was on leave because he was not permitted to enter the building where he usually retrieved his paycheck. *See* Dkt. No. 107 at ¶ 68. This claim is insufficient to establish that Plaintiff Fitzgerald was deprived of a property interest. Plaintiff Fitzgerald does not contend that he asked for his paycheck and that Defendants refused to provide him with it. Further, Plaintiff Fitzgerald does

not claim that he did not eventually receive the compensation he was due.  Since Plaintiff

Fitzgerald was fully paid while on administrative leave, his deprivation of a property interest

without due process claim must fail.  *See O'Connor v. Pierson*, 426 F.3d 187, 199 (2d Cir. 2005)

(holding that "no court has held that an employee on fully paid leave has been deprived of a

property right merely by virtue of being relieved of his job duties.  Indeed, such a position would

seem to run afoul of *Loudermill*, which observed that a state employer, wishing to terminate an

employee immediately without providing the pre-termination hearing that due process requires,

may suspend the employee without pay" (citation omitted)); *see also Weg v. Macchiarola*, 729 F.

Supp. 328, 337 (S.D.N.Y. 1990) (holding that the plaintiff's "case is further weakened by the fact

that . . . , except for two brief periods, he received his pay on a regular basis during his

suspension, and the pay that was withheld was eventually repaid to him").

Similarly, the fact that Plaintiff Fitzgerald may have lost out on "overtime opportunities"

is insufficient to support this claim.  Plaintiffs provide no evidence to suggest that the collective

bargaining agreement between the police department and City of Troy creates an absolute

property interest in the ability to work overtime.  *See Arteta v. County of Orange*, 141 Fed Appx.

3, 7 (2d Cir. 2005).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to

Plaintiffs' fourth claim.


**E.     Deprivation of liberty interest without due process**

In the fifth claim, Plaintiffs allege that Plaintiff Fitzgerald was deprived of a

constitutionally protected liberty interest, *i.e.*, his good name and employment, without due

process.  *See* Dkt. No. 39 at ¶¶ 129-133.  Defendants assert that this claim should be dismissed

because Plaintiffs have failed to demonstrate both "a stigma and some other independent deprivation" which is necessary to establish a protected liberty interest. *See* Dkt. No. 100 at 26-27. Plaintiffs argue that they have established an independent deprivation because, in the Second Circuit, the deprivation of a property interest satisfies the "plus" prong of the "stigma-plus" standard. *See* Dkt. No. 109 at 38.

The Supreme Court has made clear that there is no constitutionally protected property or liberty interest in one's reputation. *See Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (citation omitted); *Paul v. Davis*, 424 U.S. 693, 701 (1976). However, when an individual is defamed or stigmatized in the course of his dismissal from public employment, he does have a cognizable liberty interest. *See Codd v. Velger*, 429 U.S. 624, 628 (1977) (citation omitted); *Paul*, 424 U.S. at 709 (citation omitted). This claim, which is known as a "stigma-plus" claim, is accorded only procedural due process protection – specifically, the right to an opportunity to refute the charges and clear one's name and reputation. See *Codd*, 429 U.S. at 627; *Paul*, 424 U.S. at 710; *Roth*, 408 U.S. at 573.

To defeat a motion for summary judgment on a "stigma-plus" claim, a plaintiff must show four things. First, the plaintiff must show that the government employer made stigmatizing statements about him. *See Patterson v. Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (citation omitted). "Stigmatizing statements" are defined as those that "call into question plaintiff's 'good name, reputation, honor, or integrity.'" *Id.* (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980)). Moreover, "[s]tatements that 'denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession'" are stigmatizing. *Id.* (quotation and footnote omitted).

37

Second, the plaintiff must show that "the falsity of these stigmatizing statements [i]s an

issue."  *Id.* (citing *Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 43 (2d Cir. 1987)); *see also*

*Marinaccio v. Boardman*, No. 1:02 CV 00831, 2005 WL 928631, *20 (N.D.N.Y. Apr. 19, 2005)

("To the extent Plaintiffs claim the language regarding [the individual plaintiff's] ban is

stigmatizing, same cannot be the basis for their liberty interest claim because its truth is not

disputed").  Third, the plaintiff must show that "the[ ] stigmatizing statements were made public."

*Patterson*, 370 F.3d at 330 (citation omitted).  Statements made "only to the plaintiff, and only in

private, ordinarily [do] not implicate a liberty interest."  *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir.

2005) (citation omitted).  Finally, the plaintiff must show that the stigmatizing statements were

made in the course of, or in close temporal proximity to, a discharge or significant demotion.  *See*

*Patterson*, 370 F.3d at 330 ("[P]laintiff must show the stigmatizing statements were made

concurrently in time to plaintiff's dismissal"); *see also Stone v. Univ. of Md. Med. Sys. Corp.*, 855

F.2d 167, 172 n.5 (4th Cir. 1988) (citations omitted).

In the present matter, Plaintiffs have adduced sufficient record evidence to create at least a

question of fact with regard to the first three elements.  Specifically, Defendant Tutunjian's

official statement reinstating Plaintiff Fitzgerald contains several statements that could be seen as

stigmatizing false statements that were released to the public.  *See* Dkt. No. 39 at pg. 40.

Plaintiffs fail, however, to put forth sufficient record evidence to create a genuine issue of

material fact with respect to the fourth element.

The final element constitutes the "plus" part of the claim.  Courts have required a

"significant alteration of plaintiff's employment status" in order to show the plus factor.  *See*

*Patterson*, 370 F.3d at 332 (2d Cir. 2004).  In *Patterson*, the Second Circuit held that the plaintiff

who was rehired two weeks after being terminated, did not have standing for a stigma-plus claim

because "his time off the job is more analogous to a suspension than a termination of employment." *Id.*; *see also Dobosz v. Walsh*, 892 F.2d 1135, 1140 (2d Cir. 1989) (holding that the plaintiff who was reinstated after a five-month suspension did not suffer "a related alteration of his legal status" to give rise to a protected liberty interest); *Ethier v. City of Cohoes*, No. 1:02-CV1584, 2006 WL 1007780, *5 (N.D.N.Y. Apr. 18, 2006) (holding that a suspended police officer failed to show the deprivation of a tangible interest because he "was not terminated from his employment").

Since Plaintiff Fitzgerald was not terminated from his employment and because he has failed to put forth any evidence suggesting that he has suffered a "significant alteration" of his employment, the Court grants Defendants' motion for summary judgment as to Plaintiffs' sixth claim.

**F.     Plaintiffs' Fourth Amendment claim**

In the sixth claim, Plaintiffs allege that Plaintiff Fitzgerald's Fourth Amendment right to privacy was violated when "Defendants caused a management-designated police escort to accompany [P]laintiff at all times in the police station, including when he went to the restroom where the management-designated police escort was required to watch him urinate." *See* Dkt. No. 39 at ¶¶ 135-138.  Plaintiffs do not oppose the dismissal of this claim.  *See* Dkt. No. 109 at 43.

Since Plaintiffs do not oppose the dismissal of this claim, the Court grants Defendants' motion for summary judgment as to Plaintiffs' sixth claim.

**G.     Plaintiffs' conspiracy claims**

In the seventh claim for relief, Plaintiffs allege that Defendants Tutunjian, Tedesco and Mitchell, along with "elected and appointed members of City government" conspired to violate their civil rights in violation of 42 U.S.C. § 1985. *See* Dkt. No. 39 at ¶¶ 139-142. Defendants assert that this claim should be dismissed because "(a) the allegations in the Complaint do not adequately or plausibly allege any conspiracy; (b) a conspiracy claim against these defendants is precluded by the 'intra-corporate conspiracy' doctrine;" (c) neither Plaintiff qualifies as a member of a group designed to be the beneficiary of the constitutional remedy provided in section 1985(3) and neither can establish any racial or otherwise class-based invidious discriminatory animus; and (d) absent an underlying constitutional violation, a conspiracy claim cannot be maintained. *See* Dkt. No. 100 at 32-36. Plaintiffs, however, contend that they have plausibly pled such a conspiracy claim pursuant to section 1983, and that because Carolin Collier is not a member of the executive branch of the Troy City government, as are the named Defendants, the intra-corporate conspiracy doctrine does not preclude this claim.[10] *See* Dkt. No. 109 at 42-43.

To sustain a cause of action for conspiracy to violate a plaintiff's civil rights under section 1985(3), a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunities secured by law. *See United Bhd. of Carpenters & Joiners, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 834-39 (1983); *see also Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) (citation omitted). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be evidenced circumstantially, through a showing that the parties had a "'tacit understanding to carry out the

---

[10] Plaintiffs acknowledge that they were unable to find case law on point to support this assertion.

prohibited conduct.'" *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (quoting *United State v. Rubin*, 844 F.2d 979, 984 (2d Cir. 1988)) (other citations omitted).  This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) (citation omitted).

"'To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Benitez v. Ham*, No. 9:04-CV-1159, 2009 WL 3486379, *18 (N.D.N.Y. Oct. 21, 2009) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right.  *See Malsh v. Austin,* 901 F. Supp. 757, 763-64 (S.D.N.Y. 1995) (citation omitted).  Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights.  *See id.*

For both types of conspiracy claims, "[c]onclusory or vague allegations of conspiracy are insufficient to survive a motion for summary judgment." *Zaidai v. Amerada Hess Corp.*, 723 F. Supp. 2d 506, 515 (E.D.N.Y. 2010) (citing *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993)).  To maintain a conspiracy claim under either section 1983 or section 1985, the plaintiff must establish that the defendants violated one of his constitutional rights.  *See Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (citations omitted); *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (citation omitted).

The intra-corporate conspiracy doctrine, which applies to conspiracy claims pursuant to both 42 U.S.C. § 1983, *see Dilworth v. Goldberg*, No. 10 Civ. 2224, 2012 WL 4017789, *30

41

(S.D.N.Y. Sept. 13, 2012); *Anemone v. Metropolitan Transportation Authority*, 419 F. Supp. 2d

602, 603-04 (S.D.N.Y. 2006), and 42 U.S.C. § 1985, *see Herrmann v. Moore*, 576 F.2d 453, 459

(2d Cir. 1978), "posits that officers, agents, and employees of a single corporate or municipal

entity, each acting within the scope of his or her employment, are legally incapable of conspiring

with each other." *Jefferson v. Rose*, ___ F. Supp. 2d ___, 2012 WL 1398743, *4 (E.D.N.Y. Apr.

23, 2012) (quotations and citations omitted); *see also Smith v. Town of Hempstead Department of

Sanitation Sanitary District No. 2*, 798 F. Supp. 2d 443, 461 (E.D.N.Y. 2011) (citation omitted).

The intra-corporate conspiracy doctrine "extends to public corporate bodies, including

municipalities." *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 466 (E.D.N.Y. 2011) (citation

omitted); *see also Michael v. County of Nassau*, No. 09-cv-5200, 2010 WL 3237143, *5

(E.D.N.Y. Aug. 11, 2010) (holding that the intra-corporate conspiracy doctrine applies to

municipalities).

     In the present matter, contrary to Plaintiffs' position, the intra-corporate conspiracy

doctrine precludes their conspiracy claims because all alleged conspirators were employed by the

same municipal entity.  *See Baines v. Masiello*, 288 F. Supp. 2d 376, 394-95 (W.D.N.Y. 2003)

(holding that a conspiracy claim brought against "the Common Council, the Mayor, and the City

Clerk" was barred by the intra-corporate conspiracy doctrine); *Broich v. Incorporated Vill. of

Southampton*, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (holding that conspiracy claim against

the Village Board trustees, mayor, and former and current chief of police are barred by the intra-

corporate conspiracy doctrine) (citations omitted).  Further, Plaintiffs have failed to present any

evidence to suggest that Defendants were not acting in furtherance of the City's interests, but were

instead motivated by some other personal interest independent of the City's interests, thereby

rendering the intra-corporate conspiracy doctrine inapplicable.  *See Broich*, 650 F. Supp. 2d at

247 (citation omitted).

Based on the foregoing, the Court finds that Plaintiffs' conspiracy claims are precluded by the intra-corporate conspiracy doctrine.  As such, the Court grants Defendants' motion insofar as it seeks dismissal of Plaintiffs' conspiracy claims.

**H.     Plaintiffs' Fair Labor Standards Act claim**

In the ninth claim, Plaintiff Fitzgerald alleges that Defendants violated the FLSA when they failed to provide him with his paycheck on April 20, 2007.  *See* Dkt. No. 39 at ¶ 148. Plaintiff Fitzgerald asserts that, under the FLSA, "[l]ate payment of wages is the equivalent of a failure to pay wages[.]"  *See id.* at ¶ 151.  Defendants contend that Plaintiff Fitzgerald has failed to set forth a *prima facie* claim under the FLSA and that, even if he has, his claim accrued at the time of the alleged failure to pay and is barred by the two-year statute of limitations.  *See* Dkt. No. 100 at 36.

"The FLSA generally provides for a two-year statute of limitations on actions to enforce its provisions, but allows a three-year limitations period for 'a cause of action arising out of a willful violation.'"  *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999) (quoting 29 U.S.C. § 255(a)).  "The fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 (1988).

Proof of willfulness requires a factual showing that the employers either "'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA].'"  *Porter v. New York Univ. School of Law*, 392 F.3d 530, 531 (2d Cir. 2004) (quotation omitted).  To

43

establish that a violation of the FLSA was willful, an employee must prove that the employer was more than negligent.  *See McLaughlin*, 486 U.S. at 135 (citation omitted).  Neither an employer's "good-faith but incorrect assumption" regarding its FLSA obligations, nor an employer's lack of a reasonable basis for believing that it was complying with the FLSA, is by itself sufficient to demonstrate an employer's willfulness.  *See id.*  It is the plaintiff's burden to show willfulness. *See id.* at 133 (citation omitted).

In the present matter, Plaintiffs have failed to establish that Defendants' alleged violation of the FLSA was willful.  In their response, Plaintiffs provide two sentences explaining why Defendants conduct should be considered willful.  First, Plaintiffs claim that "[t]he Complaint here alleges a willful violation (Amended Complaint ¶ 153)."  *See* Dkt. No. 109 at 41.  Second, Plaintiffs argue that "[c]learly, defendants showed a 'reckless disregard' . . . for whether plaintiff received his paycheck on time."  *See id.* (internal citation and footnote omitted).  Plaintiffs' conclusory allegations are insufficient for the Court to find that the three-year statute of limitations should apply or that there is a question of fact as to its application.

As Defendants point out, during his deposition, Plaintiff Fitzgerald testified that when he did not receive his paycheck on April 20, 2007, he did not call anyone at the police station regarding his paycheck and was unable to explain why not.  *See* Dkt. No. 92-3 at 38-39.  Further, Plaintiff was permitted back in the police station on April 25, 2007, but he could not recall if he retrieved his paycheck on Friday, April 27, 2007.  *See id.* at 39.  When asked why he did not call anyone at the station to inquire about retrieving his paycheck, the following exchange occurred:

> A:  I just didn't.
>
> Q:  Didn't you want your paycheck?
>
> A:  I did want it.

Q:      Why didn't you call somebody?

A:      I just didn't.

*See id.* at 38-39.

This testimony and Plaintiff Fitzgerald's other conclusory assertions discussed above clearly fail to carry his burden of establishing that Defendants' conduct was willful.  At best, Plaintiffs may have established that Defendants were negligent in failing to ensure that Plaintiff Fitzgerald received his paycheck on payday, which is insufficient to support his claim that the FLSA's three-year statute of limitations for willful violations should apply.  *See McLaughlin*, 486 U.S. at 135 (citation omitted).  Therefore, because Plaintiff Fitzgerald's FLSA claim accrued on April 20, 2007 and because he has not established that Defendants acted willfully, it is barred by the two-year statute of limitations.[11]

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiffs' FLSA claim.

I.      **Plaintiffs' tenth and eleventh claims**

In the amended complaint, Plaintiffs tenth and eleventh claims are brought pursuant to the New York State Labor Law.  *See* Dkt. No. 39 at ¶¶ 156-163.  Defendants contend that these

---

[11] The Court also notes that the affidavit of Joseph Mazzariello, who is the Deputy City Comptroller and Director of Financial Operations for the City of Troy, establishes that Plaintiff Fitzgerald was on administrative leave with pay from April 17, 2007 through May 4, 2007.  *See* Dkt. No. 114-3 at ¶ 5.  Moreover, the affidavit and attached exhibits also show that Plaintiff Fitzgerald was issued a paycheck on April 20, 2007 for the pay period April 8-14, 2007, and that there was and is a six (6) day lag between the end of a pay period and the issuance of payroll checks.  *See id.* at ¶¶ 6-7 & Exhibit "A."  Further, Plaintiff Fitzgerald was issued a paycheck on April 27, 2007 for the pay period of April 15-21, 2007, on May 4, 2007 for the pay period of April 22-28, 2007, and on May 11, 2007 for the pay period of April 29 through May 5, 2007.  *See id.* at ¶¶ 8-10 & Exhibit "A."

claims should be dismissed because Plaintiffs failed to serve the City with a Notice of Claim within ninety (90) days of the date the claim arose.  *See* Dkt. No. 100 at 36-37.  In their response to Defendants' motion, Plaintiffs state that they do not oppose the dismissal of these claims.  *See* Dkt. No. 109 at 43.

In light of the fact that Plaintiffs' do not oppose the dismissal of these claims and because they acknowledge that they failed to comply with the Notice of Claim requirements, the Court grants Defendants' motion insofar as it seeks the dismissal of Plaintiffs' tenth and eleventh claims. *See Kalias v. City of Buffalo*, 306 A.D.2d 932, 934 (4th Dep't 2003); *Crosland v. City of New York*, 140 F. Supp. 2d 300, 312 (S.D.N.Y. 2001).

**J.      Qualified immunity[12]**

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified

---

[12] Although this section of Defendants' motion argues that Defendant Tutunjian is entitled to qualified immunity, in a footnote Defendants contend that "[t]his argument is also advanced on behalf of [D]efendants Tedesco and Mitchell should the Court conclude the participation of either or both in the decision-making process on [April] 17, 2007 was sufficient to make either or both responsible for those decisions." *See* Dkt. No. 100 at 38 n.18.  This is the first and only time that Defendants explicitly make the argument that Defendants Tedesco and Mitchell were not personally involved in the alleged constitutional conduct.

> immunity unless the very action in question has previously been
> held unlawful, but it is to say that *in the light of pre-existing law the*
> *unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creiehton*, 483 U.S.

635, 640 (1987)) (emphasis in original).  "Where the right at issue in the circumstances

confronting [the] officers . . . was clearly established but was violated, the officers will

nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to

believe their acts did not violate those rights.'"  *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir.

2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the

officer of qualified immunity, the doctrine does not shield performance that either (a) was in

violation of clearly established law, or (b) was plainly incompetent."  *Manganiello v. City of New*

*York*, 612, F.3d 149, 165 (2d Cir. 2010) (citations omitted).  "With respect to both the legal

question and the matter of competence, the officials' actions must be evaluated for objective

reasonableness. . . .  That is, '[e]ven if the right at issue was clearly established in certain respects

. . . an officer is still entitled to qualified immunity if "officers of reasonable competence could

disagree" on the legality of the action at issue in its particular factual context.'"  *Id.* (quotations

omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed

question of law and fact.  *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374

F.3d 93, 109 (2d Cir. 2004)) (other citations omitted).  "The ultimate question of whether it was

objectively reasonable for the officer to believe that his conduct did not violate a clearly

established right, *i.e.*, whether officers of reasonable competence could disagree as to the

lawfulness of such conduct, is to be decided by the court.  However, '[a] contention that . . . it was

objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

In the present matter, it is clear that Defendants Tutunjian and Tedesco are not entitled to qualified immunity at this time because issues of fact exist. The law was clearly established at the time of the alleged retaliatory conduct that a governmental entity "may not inflict an adverse employment decision upon an employee in retaliation for the employee's exercise of his First Amendment rights." *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 107 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008); *Catletti ex rel. Estate of Catletti v. Rampe*, 334 F.3d 225, 231 (2d Cir. 2003); *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 211 (2d Cir. 2002) ("The employee's right to be free from such retaliation has been clearly established since at least 1968"). Moreover, although seeking the advice of counsel can, in certain circumstances, demonstrate that a defendant is entitled to qualified immunity, such is not the case here. *See* Dkt. No. 89-11 at 44, 64; *see also Mata*, 685 F. Supp. 2d at 1280 (noting that, in certain circumstances, seeking the advice of counsel can constitute an "extraordinary circumstance" entitling a defendant to qualified immunity" (citing *V-1 Oil Co. v. State of Wyo.*,

*Dept. of Environmental Quality*, 902 F.2d 1482, 1488 (10th Cir. 1990)).  While it is true that

Defendant Tutunjian requested the advice of Defendant Mitchell and Mr. Goldberger before he

took action against Plaintiff Fitzgerald, he ignored Defendant Mitchell's advice that he should not

take action against Plaintiff Fitzgerald until after the Internal Affairs investigation was concluded.

*See id.* (citation omitted).  The circumstances of this case, including testimony regarding

Defendants Tutunjian and Tedesco's dislike of Plaintiff Fitzgerald's union activities and his

comments provided to the various media outlets, prevent the Court from finding that Defendants

Tutunjian and Tedesco are entitled to qualified immunity at this time.

       Further, although the Court already found that Defendant Mitchell was not personally

involved in any of the alleged unconstitutional conduct, alternatively, the Court finds that he is

entitled to qualified immunity.  Plaintiffs do not allege, nor could they, that Defendant Mitchell,

as corporation counsel, had authority to discipline Plaintiff Fitzgerald.  Defendant Mitchell

simply provided advice to Defendants Tutunjian and Tedesco and prepared the memorandum

placing Plaintiff Fitzgerald on administrative leave pursuant to Defendant Tutunjian's instruction.

*See* Dkt. No. 89-11 at 44.  In fact, Defendant Mitchell even opposed placing Plaintiff Fitzgerald

on administrative leave until the conclusion of the Internal Affairs investigation.  *See id.* at 64.

Considering these undisputed facts, the Court finds that Defendant Mitchell acted in an

objectively reasonable manner and is, therefore, entitled to qualified immunity.  *See Appel v.

Spiridon*, Nos. 3:06cv177, 3:07cv1237, 2011 WL 36551353, *14 (D. Conn. Aug. 18, 2011)

(holding that "[f]ollowing a supervisor's orders does not alone entitle a defendant to qualified

immunity[;] . . . however, where a defendant lacks authority to issue or stop the adverse

employment action he cannot be considered to have retaliated against the plaintiff and is therefore

entitled to qualified immunity" (citing *Deters v. Lafuente*, 368 F.3d 185, 189–90 (2d Cir. 2004))

(internal citation omitted).

Since the objective reasonableness of their actions depends, at least in part, on their alleged motivation in dealing with Plaintiff Fitzgerald and Plaintiff PBA, the Court holds that questions of fact preclude finding that Defendants Tutunjian and Tedesco are entitled to qualified immunity at this time. *See Vega v. Artus*, 610 F. Supp. 2d 185, 211 (N.D.N.Y. 2009) (citation omitted). Further, the Court holds that the undisputed facts demonstrate that Defendant Mitchell is entitled to qualified immunity and, therefore, is dismissed from this case.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**;[13] and the Court further

**ORDERS** that all claims against Defendant Mitchell are **DISMISSED**; and the Court further

**ORDERS** that Defendants' request for an order *nunc pro tunc* authorizing the submission of a reply memorandum of law in excess of the permitted length is **GRANTED**;[14] and the Court

---

[13] As a result of this Memorandum-Decision and Order, Plaintiffs' only remaining claims are their First Amendment retaliation claims against Defendants Tutunjian, Tedesco and the City of Troy.

[14] Plaintiffs "object" to Defendants' submission and the Court's consideration of the Affidavits of Christopher Myers and Joseph Mazzariello because they were not listed "as individuals likely to have discoverable information" in Defendants' initial and two supplemental Rule 26(a) disclosures. *See* Dkt. No. 117. As Defendants correctly note, Plaintiffs fail to assert how they have been prejudiced or harmed by this alleged failure, and the Court fails to see how this oversight is anything but harmless. *See Hein v. Cuprum, S.A., De C.V.*, 53 Fed. Appx. 134,

(continued...)

further

     **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: December 7, 2012
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[14](...continued)
136 (2d Cir. 2002) (citation omitted).  As such, the Court denies Plaintiffs' "motion" to preclude this evidence.